UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALI J. NAINI,

                          Plaintiff,

        v.

KING COUNTY HOSPITAL DISTRICT NO.
2 *et al.*,

                          Defendants.

CASE NO. C19-0886-JCC

ORDER

        This matter comes before the Court on Defendants' partial motion to dismiss (Dkt. No. 32). Having considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion in part and DENIES the motion in part for the reasons explained herein.

## I.      BACKGROUND

        In early 2012, Plaintiff Ali J. Naini, a neurosurgeon who works at Defendant King County Hospital District No. 2 ("Evergreen"), became concerned that physicians in Evergreen's intensive care unit were improperly advising his elderly patients to consent to Do Not Resuscitate designations or transfers to end-of-life palliative hospice care without his knowledge. (*See id.* ¶¶ 32–34.) Plaintiff raised his concerns to Evergreen's administration, telling the hospital that these patients could be saved with more aggressive treatment. (*See id.* ¶ 45.) According to

Plaintiff, his concerns were not taken seriously. (*See id.* ¶ 45.) Instead, specific employees at Evergreen purportedly responded by campaigning to have the hospital revoke Plaintiff's medical staff privileges. (*Id.* ¶ 220.)

The campaign against Plaintiff was allegedly spearheaded by Defendant Melissa D. Lee, M.D., the medical director of Evergreen's ICU and the director of the hospital's Quality Assurance Committee. (*See id.* ¶¶ 24, 46–60.) In 2013, Dr. Lee urged Evergreen to approve a set of "Neurosurgical Co-Management Guidelines" that would limit Plaintiff's authority over his patients in the ICU. (*Id.* ¶ 57.) Dr. Lee's efforts proved successful, and Evergreen ultimately adopted the guidelines on January 5, 2016. *(Id.* ¶ 59.)

That same year, a conflict arose over the treatment of two of Plaintiff's patients. (*Id.* ¶ 67.) Plaintiff expressed his concerns regarding those patients' treatment to Defendant Robert E. Geise, M.D., the then-president of Evergreen's medical staff. (*Id.* ¶ 68.) At the same time, Dr. Lee contacted Dr. Geise and asserted that Plaintiff was breaking Evergreen's new co-management policy. (*Id.* ¶ 71.) After hearing from Dr. Lee, Dr. Geise met with Defendant James O'Callaghan, M.D., and Dr. Scott Burks on June 23, 2016, to create a "to do" list for Plaintiff. (*Id.* ¶ 73.) Dr. Geise then held a meeting with Dr. Lee and other ICU staff. (*Id.* ¶ 76.) At the meeting, Dr. Lee urged Evergreen's administration to act against Plaintiff. (*Id.* ¶ 77.) Dr. Geise assured Dr. Lee that he had a "plan for formal review." (*Id.*)

The day after the meeting, Dr. Geise initiated an *ad hoc* process that, according to Plaintiff, was intended to justify a Focused Professional Practice Examination-Concern period for Plaintiff.[1] (*Id.*) As part of that process, Dr. Geise appointed Dr. Sean Kincaid as head of a committee to investigate Plaintiff's patient care. (*Id.* ¶ 78.) Dr. Geise also instructed two unidentified Evergreen neurosurgeons to perform internal reviews of the medical records of three patients that Plaintiff admitted to the ICU in the spring of 2016. (*Id.* ¶ 80.) And when that

---

[1] "An FPPE-C is a time-limited period during which a hospital evaluates and determines a physician's professional performance." (*Id*. ¶ 73.)

internal review concluded that Plaintiff had given adequate care to those three patients, Dr. Geise commissioned an external reviewer to assess Plaintiff's care in each case. (*Id.* ¶¶ 91–92.) Although the reviewer issued a report that was generally favorable towards Plaintiff's clinical competency, the report raised issues relating to documentation and co-management policies. (*Id.* ¶¶ 92–96.) Given these purported issues, Defendants subsequently informed Plaintiff on September 12, 2016, that they had created an FPPE-C requiring Plaintiff to complete tasks relating to his communication with colleagues and staff. (*Id.* ¶ 98.)

On April 3, 2017, Dr. Geise sent a letter demanding that Plaintiff also complete a competency assessment at the University of California in San Diego. (*Id.* ¶ 102.) When Plaintiff refused to undergo the assessment, Dr. Geise sent Plaintiff another letter on September 27, 2017, stating that if Plaintiff did not go to California, "the Medical Staff will consider your non-compliance as a voluntary resignation." (*Id.* ¶ 118.) Dr. Geise's second letter prompted Plaintiff to file the initial complaint in this case in King County Superior Court, requesting a temporary restraining order preventing Evergreen from terminating his privileges. (*Id.* ¶ 118.) In response to Plaintiff's request, Defendants withdrew the assessment requirement. (*Id.* ¶ 119.)

After withdrawing the assessment requirement, Evergreen implemented a "Corrective Action Plan" involving an ongoing review of Plaintiff's cases in 2018. (*Id.* ¶ 122.) That review identified potential issues in three cases, which were then sent for review to the Credentials Committee. (*Id.* ¶ 130.) The Credentials Committee met on January 9, 2019, and voted—without hearing from Plaintiff—to not renew his privileges. (*Id.* ¶¶ 131, 135.) Following the Credential Committee's decision, Dr. O'Callaghan, who by that time had become president of Evergreen's medical staff, authored a report purporting to summarize the basis for the decision. (*Id.* ¶ 137.)

On January 14, 2019, the Medical Executive Committee met and accepted the Credential Committee's recommendation to suspend Plaintiff's privileges. (*Id.* ¶ 165.) One day later, Evergreen's Board of Commissioners also held a meeting, which Dr. O'Callaghan attended. (*Id.* ¶ 168.) Once the meeting concluded, Dr. O'Callaghan told Dr. Geise that the Board had decided

to not renew Plaintiff's privileges. (*Id.* ¶ 169.) Dr. O'Callaghan similarly told Plaintiff in a telephone conversation that "the Board upheld the decision of MEC to not recommend re-credentialing" and that Plaintiff's privileges were therefore terminated. (*Id.* ¶ 170.) But Plaintiff alleges that Dr. O'Callaghan was incorrect: "the Board had not approved anything." (*Id.* ¶ 181.)

Even though "[Plaintiff's] privileges had never been officially rescinded," *(id.* ¶ 188), Defendants sent a broadcast email on January 17, 2019, "claiming that the Board had approved [Plaintiff's] 'resignation.'" (*Id.* ¶ 175.) The email was sent to at least 200 hospital personnel, and news of Plaintiff's alleged resignation circulated quickly throughout the medical community. (*Id.* ¶¶ 175–82.)

On February 1, 2019, the Superior Court vacated the suspension of Plaintiff's privileges. (*Id.* ¶ 186.) Plaintiff subsequently amended his complaint to add nine claims for damages against Dr. Geise, Dr. O'Callaghan, Dr. Lee, EvergreenHealth Medical Center Medical Staff,[2] and Evergreen. (*See id.* ¶¶ 192–254.) Because Plaintiff's amended complaint included federal claims under 42 U.S.C. §§ 1983 and 1985(3), Defendants removed the case to this Court. (Dkt. No. 2.) Following removal, Defendants filed the instant partial motion to dismiss. (Dkt. No. 32.)

## II.   DISCUSSION

### A.   Federal Rule of Civil Procedure 12(b)(6) Legal Standard

A defendant may move for dismissal when a plaintiff "fails to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 678. Although the court must accept as true

---

[2] In Plaintiff's response to Defendants' motion to dismiss, Plaintiff voluntarily withdrew all but his Washington Consumer Protection Act claim against the medical staff. (*See* Dkt. No. 19.) The Court therefore DISMISSES those withdrawn claims without prejudice.

a complaint's well-pleaded facts, conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper Rule 12(b)(6) motion. *Vasquez v. L.A. Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001). The plaintiff is obligated to provide grounds for their entitlement to relief that amount to more than labels and conclusions or a formulaic recitation of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Dismissal under Rule 12(b)(6) "can [also] be based on the lack of a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

### B.    Exclusivity of Wash. Rev. Code § 7.71.030

Defendants argue that Wash. Rev. Code § 7.71.030's exclusive remedies provision requires that this Court dismiss Plaintiff's various state-law claims. (*See* Dkt. No. 32 at 7–8.) Plaintiff responds with three reasons why the provision does not preclude those claims. First, Plaintiff contends that federal law, not state law, governs this case. (*See* Dkt. No. 37 at 9–12.) Second, Plaintiff claims that even if state law applies, Defendants cannot avail themselves of Wash. Rev. Code § 7.71.030's protections because Defendants did not comply with the requirements of Wash. Rev. Code § 7.71.050(2). (*See id.* at 12.) Finally, Plaintiff argues that some of his claims are unrelated to peer review. (*See id.* at 9.) The Court concludes that Wash. Rev. Code § 7.71.030 provides the exclusive state-law remedy in this case and requires that the Court dismiss Plaintiff's state-law claims.

#### 1.    The Law of the Case

As an initial matter, the Court must determine whether the Superior Court already decided that Wash. Rev. Code § 7.71.030 precludes Plaintiff's state-law claims. Defendants contend that on February 1, 2019, the Superior Court "unequivocally ruled" that the provision

bars those claims.[3] (*See* Dkt. No. 32 at 8.) This prior ruling, Defendants argue, is now the "law of the case" and precludes the Court from considering whether Wash Rev. Code § 7.71.030 bars Plaintiff's state-law claims. (*See id.*) Plaintiff disagrees, arguing that the Superior Court never had the opportunity to consider the issue because Plaintiff did not move to amend his complaint to add state-law claims for damages until May 28, 2019. (*See* Dkt. No. 37 at 7.) The Court agrees with Plaintiff.

Under the "law of the case" doctrine, "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *See United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (quoting *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993)). The doctrine applies to state court rulings made prior to a case being removed to federal court. *See Payne for Hicks v. Churchich*, 161 F.3d 1030, 1037 (7th Cir. 1998) (citing *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 435–36 (1974)). However, "[f]or the doctrine to apply, the issue in question must have been decided explicitly or by necessary implication in [the] previous disposition." *Milgard Tempering, Inc. v. Selas Corp.*, 902 F.2d 703, 715 (9th Cir. 1990). Consequently, "[a] significant corollary of the doctrine is that dicta have no preclusive effect." *Id.*

Here, the Superior Court neither explicitly nor implicitly decided whether Wash. Rev. Code § 7.71.030 bars the state-law claims now before the Court. True, the Superior Court did say at a hearing on February 1, 2019, that the provision "is the exclusive remedy in any lawsuit by a healthcare provider for any action taken by a professional review body of health-care providers." (*See* Dkt. No. 32-1 at 53–54.) But that statement merely repeats verbatim the language of Wash.

---

[3] Defendants' reply raises a new, separate argument that Plaintiff should be estopped from contradicting his representation to the Superior Court that his "remedies are those specified in 7.71.030." (*See* Dkt. No. 38 at 2–4) (quoting Dkt. No. 32-1 at 11). But the Court "need not consider arguments raised for the first time in a reply brief," *see Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007), and the Court declines to do so here because Plaintiff has had no opportunity to explain his representations.

Rev. Code § 7.71.030(1); it cannot be construed as a ruling on Plaintiff's interpretation of the word "applies" in Wash. Rev. Code § 7.71.030(1), his argument about how that provision interacts with Wash. Rev. Code § 7.71.050(2), or his assertion that some of his claims do not relate to Defendants' professional review action. *See Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 146 F.3d 1088, 1094 (9th Cir. 1998) (declining to apply the law of the case doctrine because prior judicial statements were "better read as descriptions rather than dispositions of Rebel's claims"); (Dkt. No. 38 at 8–13). None of those arguments were before the Superior Court on February 1 because Plaintiff did not amend his complaint to add additional claims for damages until several months later. (*See* Dkt. No. 28.) Moreover, if the Superior Court had intended to preclude future claims for damages, then it would not have made a point to dismiss Plaintiff's claim under the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.060, "without prejudice to any breach of contract or similar claim he may have." (*See* Dkt. No. 32-1 at 52.) The Superior Court's decision to leave open the possibility of future claims for damages shows how up until the February 1 hearing, "[Plaintiff's privileges] ha[d] always been the subject of [the] litigation." (*See id.* at 16–17.)

Even assuming that the Superior Court did intend to pass judgment on the meaning of Wash. Rev. Code § 7.71.030, the Superior Court's statement would be dicta. When the Superior Court held the February 1 hearing, Plaintiff had raised only a single damages claim—a claim relating to Defendants' decision to reduce Plaintiff's involvement in emergency room call coverage. (*See* Dkt. No. 13-8 at 28, 34.) In dismissing that claim, the Superior Court did not rely on Wash. Rev. Code § 7.71.030. (*See* Dkt. No. 32-1 at 33.) Instead, the Superior Court concluded that Defendant's decision did not impact the public interest within the meaning of the CPA. (*Id.*) It would therefore have been unnecessary for the Superior Court to decide whether Wash. Rev. Code § 7.71.030 might impede Plaintiff's ability to bring claims for damages relating to the suspension of his privileges. Accordingly, the Court declines to treat any such statements as the "law of the case" and will independently evaluate whether and how Wash. Rev.

Code § 7.71.030 applies here. *See Rebel Oil*, 146 F.3d at 1093–94.

2. The Applicability of Wash. Rev. Code § 7.71.030

Washington provides two layers of legal protection for persons who participate in a professional peer review action. The first layer comes from federal law. *See* 42 U.S.C. § 11111(a); Wash. Rev. Code § 7.71.020. Under that layer of protection, persons who participate in a "professional review action . . . shall not be liable in damages . . . with respect to the action." 42 U.S.C. § 11111(a)(1). This "peer review immunity" applies only if (1) the professional review action was based on a physician's competence or professional conduct and (2) the action meets four requirements listed in 42 U.S.C. § 11112(a). *See* 42 U.S.C. §§ 11111(a)(1) (limiting damages "[i]f a professional review action (as defined in section 11151(9) of this title) . . . meets all the standards specified in section 11112(a) of this title"), 11151(9) ("The term 'professional review action' means an action . . . which is based on the competence or professional conduct of an individual physician."). If peer review immunity does not apply, then Wash. Rev. Code § 7.71.030 offers a second layer of protection by limiting the state-law remedies that a health care provider can recover "in any lawsuit . . . for any action taken by a professional peer review body of health care providers." *See* Wash. Rev. Code § 7.71.030(1). Those remedies are limited "to appropriate injunctive relief, and damages shall be allowed only for lost earnings directly attributable to the action taken by the professional peer review body, incurred between the date of such action and the date the action is functionally reversed by the professional peer review body." *See id.* § 7.71.030(2).

Wash. Rev. Code § 7.71.030 did not always offer such generous protections. Originally, 42 U.S.C. § 11111(a) and Wash. Rev. Code § 7.71.030 covered different types of professional review actions, with the former covering actions "based on the competence or professional conduct of an individual physician," *see* 42 U.S.C. § 11151(9), and the latter covering actions "based on matters *not* related to the competence or professional conduct of a health care provider," *see* 1987 Wash. Sess. Laws 969 (emphasis added). But in 2013, the Washington

Legislature extended Wash. Rev. Code § 7.71.030's protections to actions related to a physician's competence or professional conduct. *See* 2013 Wash. Sess. Laws 1716. In doing so, the Legislature added language stating that Wash. Rev. Code § 7.71.030 provides the exclusive remedy in lawsuits relating to a professional review action only "[i]f the limitation on damages under RCW 7.71.020 and [42 U.S.C. § 11111(a)] does not apply." *See id.*

Plaintiff claims that Wash. Rev. Code § 7.71.030's exclusivity provision is inapplicable in this case because 42 U.S.C. § 11111(a) "applies." (*See* Dkt. No. 37 at 9–12.) To determine the meaning of a statutory term, a court must first look to the statute's text. *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). "If the statutory language is plain, [a court] must enforce it according to its terms." *Id.* (citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010)). Often, however, the "meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Consequently, courts must read words "in their context and with a view to their place in the overall statutory scheme." *Id.* If a statute's language is ambiguous even when read in context, then a court may look to legislative history to shed further light on the statute's meaning. *See Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 611 n.4 (1991).

In this case, Plaintiff's definition of "apply" is too broad. Under that definition, 42 U.S.C. § 11111(a) "applies"—and Wash. Rev. Code § 7.71.030 does not—whenever a professional review board takes an action based on a physician's competence or professional conduct. (*See* Dkt. No. 37 at 10.) This definition would render the 2013 amendment a nullity by making Wash. Rev. Code § 7.71.030 protect defendants only when a professional review board acted based on something other than a physician's competence or professional conduct. Plaintiff's definition is therefore contrary to the common-sense rule that "[w]hen [the legislature] acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *See Stone v. INS*, 514 U.S. 386, 397 (1995).

The better understanding of Washington's statutory scheme is that Wash. Rev. Code

§ 7.71.030 limits the damages a plaintiff may obtain in cases where a plaintiff can show that the defendant is not entitled to peer review immunity under federal law. This understanding is consistent with the scheme that the Washington Legislature established in 2013 when it extended Wash. Rev. Code § 7.71.030's protections to cases that are potentially covered by 42 U.S.C. § 11111(a). That understanding is also consistent with the text of 42 U.S.C. § 11111(a), which creates two categories of cases where a defendant is not entitled to peer review immunity. In the first category, a defendant is not entitled to immunity if the professional review action was based on something other than the physician's competence or professional conduct. *See* 42 U.S.C. §§ 11111(a)(1) (limiting damages for professional review actions "as defined in section 11151(9)"), 11151(9) (defining a professional review action as an action "based on the competence or professional conduct of an individual physician"). In the second category, the action may be based on the physician's competence or professional conduct, but the defendant is still not entitled to immunity if the action does not meet 42 U.S.C. § 11112(a)'s requirements. *See* 42 U.S.C. § 11111(a)(1) (limiting damages only "if a professional review action . . . meets all the standards specified in section 11112(a)").

For the purpose of resolving Defendants' motion to dismiss, this case falls into the second category because Defendants are asking the Court to assess the viability of Plaintiff's state-law claims while assuming that Defendants are not entitled to peer review immunity. (*See* Dkt. No. 38 at 7.) Consequently, Wash. Rev. Code § 7.71.030 "applies."

3.    The Effect of Wash. Rev. Code § 7.71.050(2)

Plaintiff argues that even if Wash. Rev. Code § 7.71.030 applies, Defendants should not receive the provision's protections because Defendants did not comply with Wash. Rev. Code § 7.71.050(2). According to Plaintiff, Wash. Rev. Code § 7.71.050(2) revokes Wash. Rev. Code § 7.71.030's protections if a professional review action does not meet the requirements of 42 U.S.C. § 11112(a). Plaintiff's interpretation implies a relationship between Wash. Rev. Code §§ 7.71.030 and 7.71.050(2) that does not exist.

To be fair, Wash. Rev. Code § 7.71.050(2) is not a model of clarity. The provision states, "A professional peer review action taken by a health care facility that imposes a revocation, suspension, or reduction of medical staff privileges or membership must meet the requirements of and is subject to 42 U.S.C. Sec. 11112," but it does not explain what happens if an action fails to meet those requirements. *See* Wash. Rev. Code § 7.71.050(2). However, Wash. Rev. Code § 43.70.075 does explain Wash. Rev. Code § 7.71.050(2)'s effect. Wash. Rev. Code § 43.70.075(1)(d) authorizes "[a] whistleblower who . . . has been subjected to reprisal or retaliatory action" to file a civil action against a retaliating health care facility. The statute then defines "reprisal or retaliatory action" to include "the revocation, suspension, or reduction of medical staff membership or privileges without following a medical staff sanction process that is consistent with RCW 7.71.050." *See* Wash. Rev. Code § 43.70.075(3)(c). This statutory context shows that Wash. Rev. Code § 7.71.050(2)'s purpose is to offer protections to whistleblowers, not to limit the scope of Wash. Rev. Code § 7.71.030.

Wash. Rev. Code § 7.71.050(2)'s legislative history confirms that the Washington Legislature added the provision to protect whistleblowers. The legislature created Wash. Rev. Code § 7.71.050(2) in 2019 when it enacted substitute house bill 1049. *See* 2019 Wash. Sess. Laws 453. The final bill report refers to SHB 1049 as a bill "[c]oncerning health care provider and health care facility whistleblower protections." Final H. Rep. 66-1049, Reg. Sess., at 1 (Wash. 2019). The report then announces that SHB 1049 creates a new cause of action for whistleblowers who are subject to reprisal or retaliatory action by a health care provider or health care facility. *Id.* Finally, the report explains how SHB 1049 defines the term "reprisal or retaliatory action," saying, "[a]bsent the adherence to a medical staff privilege sanction process, any reduction of medical staff membership or privileges qualifies as 'reprisal or retaliatory action.'" *Id.* at 2. The report makes no mention of Wash. Rev. Code § 7.71.030. *See id.* at 1–2.

Given that the Washington Legislature evidently created Wash Rev. Code § 7.71.050(2) to protect whistleblowers by helping to define the term "reprisal or retaliatory action," the Court

concludes that the provision does not silently limit Wash. Rev. Code § 7.71.030's protections.

4. <u>The Scope of Wash. Rev. Code § 7.71.030</u>

Having determined that Wash. Rev. Code § 7.71.030 applies and is not limited by Wash. Rev. Code § 7.71.050(2), the Court must decide which of Plaintiff's state-law claims are precluded by Wash. Rev. Code § 7.71.030's exclusive remedy provision.

Wash Rev. Code § 7.71.030's scope is not immediately clear from its text. Wash. Rev. Code § 7.71.030(1) states, "this section shall provide the exclusive remedy in any lawsuit . . . for any action taken by a professional peer review body of health care providers." But the provision does not define the term "action," and that term is not defined elsewhere in Washington's code. Federal law, on the other hand, does define the term "professional review action." Under that definition, professional review action includes (1) "an action or recommendation of a professional review body . . . which affects (or may affect) adversely the clinical privileges . . . of the physician" and (2) "professional review activities relating to a professional review action." *See* 42 U.S.C. § 11151(9). "Professional review activity" is, in turn, defined as "an activity of a health care entity . . . to determine whether the physician may have clinical privileges with respect to . . . the entity." *See id.* § 11151(10). These definitions are incorporated into Washington law. *See* Wash. Rev. Code § 7.71.020; *Smigaj v. Yakima Valley Mem'l Hosp. Ass'n*, 269 P.3d 323, 331–32 (Wash. Ct. App. 2012). Accordingly, Wash. Rev. Code § 7.71.030 provides the exclusive remedy for any lawsuit for "professional review action" or "professional review activit[y] relating to a professional review action" as defined by 42 U.S.C. § 11151(9)–(10). And given Wash. Rev. Code § 7.71.030's broad scope, the Court must dismiss Plaintiff's state-law claims.

*i.* *CPA Claim*

Plaintiff's CPA claim is precluded by Wash. Rev. Code § 7.71.030. The thrust of Plaintiff's CPA claim is that "Defendants used the peer review process to baselessly retaliate against [Plaintiff] for raising ethical concerns regarding patient care at Evergreen Hospital." (*See*

Dkt. No. 28 ¶ 193.) This is a claim for Defendants' professional review action regarding Plaintiff's privileges and for Defendants' professional review activity relating to that action. *See* 42 U.S.C. § 11151(9)–(10); *Perry v. Rado*, 230 P.3d 203, 208–09 (2010) (affirming dismissal of claims for breach of due process, breach of contract, and breach of fiduciary duties because Wash. Rev. Code § 7.71.030 precluded those claims). Consequently, the Court DISMISSES Plaintiff's CPA claim with prejudice.[4]

### ii. Defamation Claim

Plaintiff's defamation claim presents a harder case because it involves multiple alleged statements. Specifically, Plaintiff alleges that Defendants defamed him by (1) publishing Dr. O'Callaghan's Credentials Committee report, which explained the Committee's decision to recommend non-renewal of Plaintiff's privileges; (2) broadcasting an email announcing that Plaintiff no longer had hospital privileges because he "resigned"; and (3) making "subsequent communications." (*See id.* ¶ 199.) Each of these statements presents different issues.

The first two statements cannot form the basis of a defamation claim given Wash. Rev. Code § 7.71.030. The first statement, Dr. O'Callaghan's report, is quintessential "professional review activity relating to a professional review action": it was meant to help Evergreen determine if the hospital would renew Plaintiff's privileges. *See* 42 U.S.C. § 11151(10). The second statement, the broadcast email, is "professional review action" because an "announcement of a change in a physician's status is inherently part of the 'professional review action' protected by [42 U.S.C. § 11111(a)]." *Smigaj*, 269 P.3d at 323 (quoting *Gabaldoni v. Wash., Cty. Hosp. Ass'n*, 250 F.3d 255, 260 n.4 (4th Cir. 2001)). Consequently, Wash. Rev. Code § 7.71.030 precludes Plaintiff from bringing a defamation claim for either statement.

The "subsequent communications" Plaintiff refers to are a different matter. In theory, it is

---

[4] Because the Court dismisses Plaintiff's CPA claim on the ground that it is barred by Wash Rev. Code § 7.71.030, the Court need not decide whether Washington law permits CPA claims against municipal corporations or unincorporated associations. (*See* Dkt. No. 37 at 18–24.)

unlikely that defamatory communications made after Defendants announced the change in Plaintiff's status are "professional review action" or "professional review activity relating to a professional review action." *See* 42 U.S.C. § 11151(9)–(10). However, Plaintiff's complaint mentions only one subsequent communication. (*See* Dkt. No. 28 ¶ 190.) That communication was made in a public filing during the course of judicial proceedings. (*See id.*) It is, therefore, absolutely privileged under Washington law. *See Twelker v. Shannon & Wilson, Inc.*, 564 P.2d 1131, 1133 (Wash. 1977).

Because Plaintiff's complaint references only statements that are either privileged or covered by Wash. Rev. Code § 7.71.030, the Court DISMISSES Plaintiff's defamation claim. However, Plaintiff could cure the deficiencies in this claim by alleging facts establishing that Defendants made non-privileged, defamatory statements after Defendants' announcement that Plaintiff no longer had hospital privileges. The Court therefore GRANTS Plaintiff leave to amend his complaint to allege, if he can, that Defendants made such statements.

### iii.    *False Light*

Plaintiff's false light claim suffers from the same deficiencies as his defamation claim. (*See* Dkt. No. 28 ¶ 206.) Consequently, the Court DISMISSES Plaintiff's false light claim. The Court also GRANTS Plaintiff leave to amend his complaint to allege, if he can, that Defendants made actionable statements after Defendants sent the broadcast email.

### iv.    *Tortious Interference with Business Expectancy*

Wash. Rev. Code § 7.71.030 precludes Plaintiff's claim for tortious interference with his business expectancy. That claim is based on Defendants "retaliatory, bad faith, and improper termination of [Plaintiff's] privileges and their publication of false and defamatory statements about [Plaintiff]." (*See id.* ¶ 212.) As previously explained, these acts are either professional review action or professional review activity relating to professional review action. *See Perry*, 230 P.3d at 208–09. Accordingly, the Court DISMISSES Plaintiff's tortious interference claim with prejudice.

*v.*     *Intentional Infliction of Emotional Distress*

The acts underpinning Plaintiff's claim for intentional infliction of emotional distress are identical to the facts underpinning his CPA and tortious interference claims. (*See id.* ¶ 216.) And like those other claims, Plaintiff's IIED claim is barred by Wash. Rev. Code § 7.71.030. *See Perry*, 230 P.3d at 208–09. The Court therefore DISMISSES Plaintiff's IIED claim with prejudice.

*vi.*     *Civil Conspiracy*

Plaintiff's state-law civil conspiracy claim is also precluded by Wash. Rev. Code § 7.71.030 because the claim relates to Defendants' alleged attempt to "terminate Plaintiff's privileges . . . through the use of a sham peer review." (*Id.* ¶ 220); *see Perry*, 230 P.3d at 208–09. Accordingly, the Court DISMISSES Plaintiff's state-law civil conspiracy claim with prejudice.

**C.     Plaintiff's § 1983 Claim**

In addition to bringing state-law claims, Plaintiff brings two claims under 42 U.S.C. § 1983. First, Plaintiff asserts that Defendants violated his First Amendment rights by revoking his medical staff privileges in retaliation for his whistleblowing activity. (*See* Dkt. No. 28 ¶¶ 223–33.) Second, Plaintiff alleges that Defendants deprived him of his property interest in his privileges and his liberty interest in his reputation without due process. (*See id.* ¶¶ 234–48.) Defendants respond that Plaintiff has failed to allege sufficient facts to support a § 1983 claim against Evergreen and the individual defendants in their official capacities. (*See* Dkt. No. 32 at 13). The Court agrees with Defendants because Plaintiff has failed to allege that the Board of Commissioners ever ratified the suspension of Plaintiff's privileges or that the individual defendants' acts may be imputed to Evergreen.

Municipal entities, including municipal officials acting in their official capacities, may be sued under § 1983. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Tanner v. Heise*, 879 F.2d 572, 582 (9th Cir. 1989). However, a municipal entity is not vicariously liable for the acts of its employees; it must "cause" the plaintiff's injury. *Monell*, 436 U.S. at 694; *Tanner*, 879

F.2d at 582**.** A municipality can cause a plaintiff's injury in "one of three ways." *Gillette v.*

*Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). First, the municipality's employee might commit

a constitutional violation while acting pursuant to a government policy, practice, or custom. *Id.*

Second, an employee endowed with "final policy-making" authority might violate the plaintiff's

rights in such a way that the employee's action constitutes an act of official governmental policy.

*Id.* Third, "an official with final policy-making authority [might] ratif[y] a subordinate's

unconstitutional decision or action and the basis for it." *Id.*

Here, Plaintiff argues that Evergreen is liable because the Board of Commissioners is a

final policy maker that made the final decision to revoke his privileges. (*See* Dkt. No. 37 at 14)

(citing Dkt. No. 28 ¶¶ 168–70). But the part of the complaint that Plaintiff points to does not say

that the Board ratified the Credential Committee's recommendation to suspend his privileges.

(*See* Dkt. No. 28 ¶¶ 168–70). Rather, the complaint merely states, "Dr. O'Callaghan *told*

[Plaintiff] in a telephone conversation that 'the Board upheld the decision of MEC to not

recommend re-credentialing.'" (*See id.*) (emphasis added). And later in the complaint, Plaintiff

pleads that the Board never ratified anything. According to Plaintiff, "Dr. O'Callaghan has

acknowledged that the [broadcast] email was false: it claimed that [Plaintiff] had 'resigned' with

Board approval when, in fact, he had not resigned and the *Board had not approved anything*."

(*Id.* ¶ 181) (emphasis added); (*see also id.* ¶ 188) ("This email did not take any steps to explain

that . . . his privileges had never been officially rescinded."). Given Plaintiff's affirmative

representations in the complaint that the Board "had not approved anything," Plaintiff has not

alleged sufficient facts to establish that Evergreen is liable for the Board's actions.

As with the Board's actions, the other acts discussed in the complaint do not establish

municipal liability. While Plaintiff refers to the "actions of Defendants O'Callaghan, Geise, and

Lee," Plaintiff does not plead that those defendants are endowed with final policy-making

authority. (*See* Dkt. No. 28 ¶ 231.) Plaintiff also states that a "custom, policy, or practice of

[Evergreen] caused the violations of Plaintiff's constitutional rights," but he does not point to

any such custom, policy, or practice. (*See* Dkt. No. 28 ¶ 237). "Rule 12(b)(6) . . . requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 545.

Because Plaintiff has failed to allege facts showing that a final policy maker ratified an unconstitutional act or that Evergreen otherwise caused a violation of his rights, the Court DISMISSES Plaintiff's § 1983 claim against Evergreen and the individual defendants in their official capacities. However, the Court recognizes that there is some uncertainty as to whether Plaintiff is pleading that the Board ratified the decision to suspend his privileges. (*Compare* Dkt. No. 28 ¶ 181, *with id.* ¶ 241.) The Court therefore GRANTS Plaintiff leave to amend his complaint to allege, if he can, that the Board ratified the decision to suspend his privileges.

### D. The Applicability of the Intra-corporate Conspiracy Doctrine to 42 U.S.C. § 1985(3)

Plaintiff also brings a claim under 42 U.S.C. § 1985(3), alleging that Drs. O'Callaghan, Lee, and Geise conspired to deprive Plaintiff of his due process and First Amendment rights. (*See* Dkt. No. 28 ¶¶ 249–54.) Defendants argue that Plaintiff's § 1985(3) claim is barred by the intra-corporate conspiracy doctrine. (*See* Dkt. Nos. 32 at 15–17, 38 at 10–12.) Plaintiff responds that the doctrine does not apply in this case. (*See* Dkt. No. 37 at 15–18.) The Court agrees with Plaintiff and holds that the intra-corporate conspiracy doctrine does not bar Plaintiff from bringing a § 1985(3) claim against agents acting on a municipal corporation's behalf.[5]

_____

[5] It is unclear from Plaintiff's complaint whether he alleges a § 1985(3) claim against the individual defendants *and* Evergreen Hospital. *(See* Dkt. No. 28 ¶¶ 249–54.) Plaintiff's response to Defendants' motion to dismiss, however, refers to his "clai[m] against Evergreen Hospital . . . under 42 U.S.C. §§ 1983 and 1985." (*See* Dkt. No. 37 at 13.) To the extent that Plaintiff has asserted a § 1985(3) claim against Evergreen Hospital, the Court DISMISSES the claim because he has failed to assert that the Board ratified any part of the individual defendants' conspiracy. *See supra* Section C. The Court also notes that the parties have not briefed whether the intra-corporate conspiracy doctrine should immunize a corporation from liability even if it does not immunize the corporation's agents. *See Novotny v. Great Am. Fed. Sav. & Loan Ass'n*, 584 F.2d 1235, 1257–58 (3d Cir. 1978) (refusing to apply the doctrine but limiting its holding to claims brought against a corporate entity's officers and directors). The Court therefore limits its

The intra-corporate conspiracy doctrine rests on the legal fiction that a corporation and its agents are a "single entity" working in tandem to accomplish the corporation's objectives. *See Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 913–14 (5th Cir. 1952). Because a corporation and its agents are a single entity, courts have held that they cannot "conspire" with one another. *See, e.g.*, *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 70–71 (2d Cir. 1976); *Nelson Radio*, 200 F.2d at 913–14. A conspiracy must involve multiple actors, these courts reason, and an intra-corporate "conspiracy" involves only a single actor. *See Nelson Radio*, 200 F.2d at 913–14. Accordingly, when a corporation's agents act within the scope of their employment to accomplish an objective, neither the corporation nor its agents can be held liable for conspiracy. *See McAndrew v. Lockheed Martin Corp.*, 206 F.3d 103, 1036–37 (11th Cir. 2000).

The intra-corporate conspiracy doctrine first emerged in the 1950s in a context very different from § 1985. In *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 913–14 (5th Cir. 1952), the Fifth Circuit held that Nelson Radio failed to state a claim for "conspiracy" under section 1 of the Sherman Act because the alleged conspiracy involved only Motorola's president, sales managers, and officers. "The Act," the Fifth Circuit concluded, "does not purport to cover a conspiracy which consists merely in the fact that the officers of the single defendant corporation did their day to day jobs in formulating and carrying out its managerial policy." *Id.* at 914. This conclusion, the Supreme Court later explained, was supported by the Sherman Act's text and policies. *See Copperweld Corp. v. Indep. Tube Corp*, 467 U.S. 752, 767–77 (1984). That text makes a "basic distinction between concerted and independent action" to foster healthy competition. *Id.* at 767. While section 1 prohibits unhealthy competition by banning concerted action that retrains trade, the section allows a single firm to compete in the market place. *Id.* at 768–69. It is only when a firm attempts to monopolize that section 2 regulates the firm's

holding to the narrow issue of whether the intra-corporate conspiracy doctrine bars Plaintiff's § 1985(3) claim against Drs. O'Callaghan, Lee, and Geise in their individual capacities.

independent actions. *Id.* This critical distinction between section 1 and section 2 would be undermined if section 1 were read to prohibit intra-corporate conspiracies. *Id.* at 769–70.

Over time, a majority of circuits have imported the intra-corporate conspiracy doctrine from the Sherman Act into § 1985. *See Grider v. City of Auburn*, 618 F.3d 1240, 1261–62 (11th Cir. 2010); *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008); *Amadasu v. Christ Hosp.*, 514 F.3d 504, 507 (6th Cir. 2008); *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998); *Hartman v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 4 F.3d 465, 469–71 (7th Cir. 1993); *Richmond v. Bd. of Regents of Univ. of Minn.*, 957 F.2d 595, 598 (8th Cir. 1992); *Buschi v. Kirven*, 775 F.2d 1240, 1252–53 (4th Cir. 1985). In doing so, courts have offered varying reasons for why the doctrine should apply in civil rights cases. Most courts describe the doctrine as a kind of natural law. *See, e.g.*, *Doherty v. Am. Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984) (quoting *Nelson Radio*, 200 F.2d at 914) ("A corporation cannot conspire with itself . . . and it is the general rule that the acts of the agent are the acts of the corporation."). And a few try to ground the doctrine in history. *See Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990). But the Ninth Circuit has never decided the issue, *see Mustafa v. Clark Cty. Sch. Dist.*, 151 F.3d 1169, 1181 (9th Cir. 1998), and other courts refuse to apply the doctrine to § 1985, *see Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1127 (10th Cir. 1994) ("[T]he doctrine . . . should not be construed to permit the same corporation and its employees to engage in civil rights violations."); *Novotny v. Great Am. Fed. Sav. & Loan Ass'n*, 584 F.2d 1235, 1256–59 (3d Cir. 1978) (rejecting the doctrine), or do so while carving out exceptions, *see McAndrew*, 206 F.3d at 1035–41 (carving out an exception for § 1985(2) because that subsection involves criminal behavior); *Benningfield*, 157 F.3d at 378 (noting a "possible exception . . . where corporate employees act for their own personal purposes"); *Stathos v. Bowden*, 728 F.2d 15, 20–21 (1st Cir. 1984) (refusing to apply doctrine to a conspiracy that "went beyond 'a single act' of discrimination" and expressing skepticism about the doctrine in general). These courts question whether a doctrine originally based in anti-trust law is

compatible with § 1985's purpose. *See Brever*, 40 F.3d at 1126–27; *Stathos*, 728 F.2d at 21 (Breyer, J.) ("Where 'equal protection' is at issue . . . one cannot readily distinguish in terms of harm between the individual conduct of one enterprise and the joint conduct of several."). They also doubt the wisdom of immunizing actors from liability for behavior that is unconstitutional and, in some circumstances, even criminal. *See McAndrew*, 206 F.3d at 1035–41; *Brever*, 40 F.3d 1129.

While courts offer differing reasons for applying or refusing to apply the intra-corporate conspiracy doctrine to § 1985, few—if any—justify their decision by discussing the Supreme Court's framework for interpreting the 1871 Civil Rights Act. *But see Novotny*, 584 F.2d at 1256–59 (declining to apply the doctrine because of § 1985's text, the statute's purpose, and the history of conspiracy law). Under that framework, "the starting point . . . must be the language of the statute itself." *Owen v. City of Indep.*, 445 U.S. 622, 636 (1980); *see Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971) (quoting *United States v. Price*, 383 U.S. 787 (1966) ("The approach of this Court to other Reconstruction civil rights statutes . . . has been to 'accord (them) a sweep as broad as (their) language.'"). The next step is to consider the common law as it existed in 1871, which is instructive for two reasons. *See id.* at 636. First, it can help reveal the meaning of terms that Congress used in 1871. *See Monell*, 436 U.S. at 687 (looking to common law to help define the term "persons" in § 1983). Second, it sometimes contains "firmly rooted" immunities that the Supreme Court is willing to apply despite their absence from the statutory text. *See Owen*, 445 U.S. at 636. Finally, one must look to see whether any interpretation or potential immunity is consistent with the statute's purpose. *See id.* (quoting *Pierson v. Ray*, 386 U.S. 547, 555 (1967)) (refusing to apply common law immunities unless they are "supported by such strong policy reasons that 'Congress would have specifically so provided had it wished to abolish the doctrine'").

When applied to § 1985(3), this framework compels the conclusion that agents acting on a municipal corporation's behalf are liable if they conspire to violate a person's constitutional

rights.

1.    The Plain Meaning of § 1985(3)

The text of § 1985(3) strongly suggests that agents acting on a municipal corporation's behalf are liable if they conspire to violate a person's constitutional rights. Section 1985(3) states,

> If two or more persons . . . *conspire* . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3) (emphasis added). Like § 1983, this language is "absolute and unqualified." *Owen*, 445 U.S. at 635. It makes "no mention . . . of any privileges, immunities, or defenses that may be asserted." *Id.* And it does not carve out immunity for any types of conspirators, such as intra-corporate conspirators. Moreover, intra-corporate conspirators fall within the statute's plain meaning. *See Novotny*, 584 F.2d at 1257. Dictionaries at the time defined "conspire" as "to plot; contrive;"[6] "to concert a crime; to plot;"[7] and "[t]o unite for an evil purpose."[8] Evidently, two persons may "plot," "contrive," or "unite for an evil purpose" even if they happen to be agents of the same municipal corporation.

2.    The Common Law of Conspiracy

Although § 1985(3)'s language appears to reach intra-corporate conspiracies, the plain meaning of "conspire" is not dispositive. After all, it is possible that Congress intended for "conspire" to have a technical meaning that would exclude intra-corporate conspiracies. To

---

[6] Joseph E. Worcester, *A Dictionary of the English Language* 300 (1860).

[7] 1 Samuel Johnson, *A Dictionary of the English Language, in Which the Words Are Deducted from Their Originals, and Illustrated in Their Different Significations by Examples from the Best Writers. To Which are Prefixed, a History of the Language and an English Grammar* 391 (1832).

[8] William G. Webster & William A. Wheeler, *A Common-school Dictionary of the English Language, Explanatory, Pronouncing, and Synonymous: With an Appendix Containing Various Useful Tables: Mainly Abridged from the Latest Edition of the American Dictionary of Noah Webster* 84 (1867).

determine if Congress intended to give "conspire" a technical meaning, the Court must look to the common law in 1871. *See Monell*, 436 U.S. at 687.

When Congress enacted § 1985(3), the intra-corporate conspiracy doctrine was not "firmly established." In fact, several courts allowed criminal charges to be brought against individual employees who committed crimes on behalf of corporations. *See State v. Great Works Milling & Mfg. Co.*, 20 Me. 41, 44 (1841) ("[W]hen a crime or misdemeanor is committed under color of corporate authority, the individuals acting in the business, and not the corporation should be indicted."); *State v. Patton*, 26 N.C. (4 Ired.) 16, 17 (1843). Similarly, courts also held that corporate employees could be liable for conspiracy even if the conspirators worked for the same corporation. *See Novotny*, 584 F.2d at 1257 ("It is well-settled that an employer can conspire with his employee."); *Ochs v. People*, 16 N.E. 662, 670 (Ill. 1888); *Page v. Cushing*, 38 Me. 523, 527 (1854); *State v. Donaldson*, 32 N.J.L. 151, 156 (N.J. Super. Ct. 1867); *State v. Powell*, 63 N.Y. 88, 92 (1875). These cases led one commentator to observe that corporate employees are often indictable for wrongs committed on a corporation's behalf. 1 Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 424 (5th ed. 1872).

Despite this common-law history of courts holding corporate employees liable for conspiracy, at least one circuit court relied on history when applying the intra-corporate conspiracy doctrine to § 1985. In *Travis v. Gary Community Mental Health Center, Inc.*, 921 F.2d 108, 110 (7th Cir. 1990), Judge Easterbrook asserted, "[w]hen Congress drafted § 1985 it was understood that corporate employees acting to pursue the business of the firm could not be treated as conspirators." To justify his assertion, Judge Easterbrook pointed to the long-established principle that a corporation and its managers are "considered as one person in law." *Id.* (quoting 1 William Blackstone, *Commentaries on the Laws of England* *456 (1st ed. 1765)). While this "single-entity" principle was well-established in 1871, the principle does not inevitably excuse corporate employees from liability for intra-corporate conspiracies. Indeed, such a result is counter-intuitive: the single-entity theory was developed to *expand* corporate

liability, not contract it. *See United States v. Hartley*, 678 F.2d 961, 970 (11th Cir. 1982) ("By personifying a corporation, the entity was forced to answer for its negligent acts . . . . The fiction was never intended to prohibit the imposition of criminal liability by allowing a corporation or its agents to hide behind the identity of the other."). Moreover, there is little evidence that the "single-entity" theory was used in 1871 to immunize corporate employees who conspired with one another. The evidence instead shows the opposite—that courts routinely held employees liable when they conspired on a corporation's behalf. *See Ochs*, 16 N.E at 670; *Powell*, 63 N.Y. at 92; *Donaldson*, 32 N.J.L. at 156; *Page*, 38 Me. at 527.

Given that courts held corporate employees liable for intra-corporate conspiracies at common law, the Court declines to give the term "conspire" in § 1985(3) a technical meaning. Instead, the Court gives the term its ordinary meaning and holds that a municipal corporation's agents can "conspire" with one another.

### 3. The Purpose of § 1985(3)

The Court's conclusion about the meaning of "conspire" is buttressed by § 1985(3)'s purpose. Section 1985 was passed as part of the 1871 Civil Rights Act, Pub. L. No. 42-22, 17 Stat. 13. The Act took aim at the widespread violations of black Americans' civil rights in the South, and its strategy for doing so was multifaceted. *See Owen*, 445 U.S. at 635–36; *Monell* 436 U.S. at 665. Through § 1983, the Act sought to deter civil rights violations by individuals acting "under color of law." *See Monell*, 436 U.S. at 685–87. Through § 1985(3), the Act sought to specifically address the "group danger" posed by those who conspire with others to thwart the Constitution's promise of equal protection and equal rights. *See Brever*, 40 F.3d at 1127. As Representative Samuel Shellabarger, the sponsor of the bill in the House, explained, "[t]he whole design and scope of [§ 1985(3)] was to do this: to provide for the punishment of *any* combination or conspiracy to deprive a citizen of the United States of such rights and immunities as he has by virtue of the laws of the United States." Cong. Globe, 42d Cong., 1st Sess. 382 (April 1, 1871) (emphasis added).

Applying the intra-corporate conspiracy doctrine to § 1985(3) would undermine the statute's ability to protect people's constitutional rights. The statute functions by deterring people from pooling their resources and thereby magnifying their ability to violate people's rights. And it applies, as no one contests, to inter-corporate and non-corporate conspiracies. But "[w]here 'equal protection is at issue . . . one cannot readily distinguish in terms of harm between the individual conduct of one enterprise and the joint conduct of several." *Stathos*, 728 F.2d at 21; *see also Rebel Van Lines*, 663 F. Supp. at 792. If anything, intra-corporate conspiracies—say, of multiple police officers or multiple prosecutors—are likely more common and more harmful given the ease with which employees in the same entity can conspire with one another to discriminate. Thus, "to apply the intra-corporate conspiracy exception to public entities and officials would immunize official policies of discrimination." *See Rebel Van Lines*, 663 F. Supp. at 792.

Similar policy concerns have led courts across the country to refuse to apply the intra-corporate conspiracy doctrine to criminal laws. *See United States v. Hughes Aircraft Co.*, 20 F.3d 974, 979 (9th Cir. 1994); Geoff Lundeen Carter, *Agreements Within Government Entities and Conspiracies Under § 1985(3)—A New Exception to the Intracorporate Conspiracy Doctrine?*, 63 U. Chi. L. Rev. 1139, 1160 (1996) ("Courts today uniformly reject the intracorproate conspiracy doctrine in criminal conspiracy cases."). These cases show that "conspire" does not have a single, fixed meaning. Sometimes, a corporation's employees can conspire with one another. *See Hughes Aircraft Co.*, 20 F.3d at 979. Other times, they cannot. *See Copperweld*, 467 U.S. at 777. But in this case, what matters is that agents acting on behalf of a municipal corporation can conspire within the meaning of § 1985(3). To hold otherwise would distort the plain meaning of § 1985(3) and undermine the purpose that Congress intended the statute to serve. Accordingly, the Court DENIES Defendants' motion to dismiss Plaintiff's § 1985(3) claim to the extent that it asserts a valid claim against Drs. O'Callaghan, Lee, and Geise.

III. **CONCLUSION**

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendants'
motion for partial dismissal (Dkt. No. 32).

DATED this 18th day of October 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE