1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10
11
12
13
14
15

| | |
|---|---|
| ALI J. NAINI, | CASE NO. C19-0886-JCC |
| Plaintiff, | ORDER |
| v. | |
| KING COUNTY PUBLIC HOSPITAL DISTRICT NO. 2 d/b/a EVERGREEN HOSPITAL MEDICAL CENTER *et al.*, | |
| Defendants. | |

16
17
18

    This matter comes before the Court on Plaintiff's motion for a temporary restraining order (Dkt. No. 111). Having considered the parties' briefing and the relevant record, the Court hereby DENIES the motion for the reasons explained herein.

19    **I.    BACKGROUND**

20
21
22
23
24
25
26

    On October 25, 2017, Plaintiff filed the original complaint in this case in King County Superior Court. (Dkt. No. 11-1.) The complaint alleged that Defendants were threatening to revoke Plaintiff's hospital privileges if he did not complete a competency assessment at the University of California in San Diego. (*Id.* at 3.) The complaint further alleged that Defendants imposed the competency assessment requirement "in retaliation for ethical concerns that [Plaintiff] ha[d] expressed regarding the care of his elderly ICU patients by some hospital-employed physicians, who regularly transfer those patients . . . to hospice care, where they die

prematurely, when they could have survived to live meaningful lives." (*Id.* at 5–6.) Although Defendants denied this allegation, they withdrew "without prejudice" the competency assessment requirement, thereby preserving Plaintiff's privileges. (*See* Dkt. No. 12-8 at 8.)

Plaintiff's privileges did not remain secure for long. On January 15, 2019, Plaintiff was informed that his privileges at Evergreen had been suspended based largely on Plaintiff's purportedly substandard treatment of patients in 2018. (*See* Dkt. No. 28 at 28–36.) The Superior Court quickly undid the suspension, concluding that Defendants had likely denied Plaintiff due process and violated Evergreen's bylaws. (Dkt. No. 16-13 at 4.) The Superior Court also enjoined Defendants from "[t]aking any action that prevents, prohibits, or interferes with plaintiff's exercise of privileges and prerogatives as an active staff member of the EvergreenHealth Medical Center." (*Id.*) The Superior Court did, however, allow Evergreen to "initiate a new process, with notice and opportunity to be heard, with respect to [Plaintiff's] application to renew his privileges." (*Id.* at 6.)

Following the Superior Court's ruling, Defendants continued to engage in peer review of Plaintiff's treatment of patients in 2018. (*See* Dkt. No. 115-5 at 2–3.) As part of that peer review process, Plaintiff met with Evergreen's Quality Peer Review Committee (QPRC) on October 30, 2019, and defended his actions in seven of the cases at issue. (Dkt. No. 111 at 6.) After Plaintiff left the meeting, the QPRC voted unanimously to recommend that Evergreen suspend Plaintiff's privileges. (*Id.*)

One day later—but unrelated to the QPRC meeting—Plaintiff received a patient with a traumatic brain injury. (*Id.*) Plaintiff treated the patient for the first 28 hours that the patient was at Evergreen. (*Id.*) At that point, the patient was transferred to the care of Dr. Jeyamohan. (*Id.*) 36 hours later, the patient died. (*Id.*) The patient's death prompted Evergreen to investigate Plaintiff's care of the patient. (*See* Dkt. No. 86 at 3.) As part of that investigation, physicians and doctors met with Plaintiff on November 5, 2019. (*Id.*) Present at the meeting was Dr. Melissa Lee, a prominent defendant in this case. (Dkt. No. 111 at 7.) According to Evergreen, this

meeting raised "serious, grave concerns about [Plaintiff's] ability to provide safe patient care at Evergreen." (Dkt. No. 86 at 3.) Due to those concerns, Evergreen asked the Court to vacate the Superior Court's preliminary injunction so that Evergreen could invoke Article 16 of its bylaws and suspend Plaintiff's privileges pending an investigation. (*Id.* at 4–5, 10.) The Court granted Evergreen's request while noting that Plaintiff would be "free to challenge . . . any ultimate decision that Evergreen makes regarding Plaintiff's privileges." (Dkt. No. 94 at 5.)

On November 14, 2019, Dr. Jeffrey Tomlin, Evergreen's CEO, notified Plaintiff that Evergreen was summarily suspending his privileges based on his care of the patient who had recently died. (Dkt. No. 111 at 8.) Then, on December 11, 2019, Evergreen notified Plaintiff by letter that the Medical Executive Committee ("MEC") had voted to approve the QPRC's recommendation to terminate his privileges. (Dkt. No. 114-4 at 2–4.) Although the QPRC purportedly based its recommendation on the 2018 cases, the letter stated that the MEC based its decision on both the 2018 cases and Plaintiff's treatment of the recently deceased patient. (*Id.*) The letter also stated that the summary suspension had been stayed because Plaintiff had "voluntarily decided" not to exercise his privileges while Evergreen investigated the patient's death.[1] (*Id.* at 3.) Finally, the letter notified Plaintiff that Evergreen planned to report Plaintiff's decision to the National Practitioner Data Bank ("NPDB") on December 22, 2019. (*Id.* at 4.) Plaintiff now seeks to prevent Evergreen from making a report to the NPDB. (Dkt. No. 111 at 9.)

## II.    DISCUSSION

Congress enacted the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11101–11152, to "restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent

---

[1] The parties dispute whether Plaintiff surrendered his privileges. (*See* Dkt. Nos. 111 at 11–12, 111 at 16–17.) That dispute is not relevant to the Court's decision. Regardless of whether Plaintiff surrendered his privileges or was suspended, Evergreen would still be required to file a report to the NPDB. *See* 42 U.S.C. § 11133(a)(1)(A)–(B). And Plaintiff argues that in either case, Evergreen's bad-faith actions set the reporting process in motion. (*See* Dkt. No. 111 at 20.)

performance." 42 U.S.C. § 11101(2). To accomplish that goal, Congress required that health care entities file reports to the NPDB whenever they suspend a physician's privileges for longer than 30 days or whenever they accept the surrender of a physician's privileges while the physician is under investigation. 42 U.S.C. § 11133(a)(1)(A). At the same time, Congress set up a process by which physicians could challenge reports that health care entities file to the NPDB. *See* 45 C.F.R. § 60.21. Here, Plaintiff asks the Court to interfere with this congressional scheme by prohibiting Evergreen from reporting the suspension of his privileges because a jury might ultimately conclude that there is no basis for the suspension. While such an intervention might be justified in extreme circumstances, Plaintiff has not shown that those circumstances are present here.

### A.   Legal Standard

Preliminary injunctive relief is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). To obtain such relief, a party must "make a showing" on each of the following elements: (1) that the party will suffer irreparable harm in the absence of preliminary relief; (2) that the balance of equities tips in favor of granting an injunction; (3) that granting an injunction is in the public interest; and (4) that the party is likely to succeed on the merits. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). What is required to "make a showing" on the fourth element depends on the strength of the party's showing on the first three elements. *Id.* Thus, if a party shows that it will suffer irreparable harm, that the balance of equities tips in its favor, and that granting an injunction is in the public interest, then the party need only show that there are "serious questions on the merits." *Id.*

### B.   Irreparable Harm

Plaintiff would suffer irreparable harm if Evergreen reports him to the NPDB. Evergreen's report would declare that Plaintiff "is under investigation by [Evergreen] relating to possible incompetence or improper professional conduct." 42 U.S.C. § 11133(a)(1)(B)(i). That

report would be shared far and wide: every hospital at which Plaintiff holds privileges or might seek future privileges would be required to review the report whenever he applies for privileges and every two years thereafter. 42 U.S.C. § 11135(a); 45 C.F.R. § 60.17. Thus, to obtain privileges at another hospital, Plaintiff would have to overcome the stigma created by an investigation into his competence and professional conduct. That stigma is serious, and multiple courts have recognized that it constitutes irreparable harm. *Rosario v. Weirton Med. Ctr.*, 2018 WL 1960952, slip op. at 2 (W.D. Pa. 2018); *Walker v. Mem'l Health Sys. of East Texas*, 231 F. Supp. 3d 210, 216 (E.D. Tex. 2017) ("[A]n adverse report almost certainly proves detrimental to a practitioner's livelihood."); *Russo v. Jones*, 2010 WL 2612628, slip op. at 4 (D. Haw. 2010); *Doe v. Cmty. Med. Ctr., Inc.*, 221 P.3d 651, 661 (Mont. 2009).

The potential for irreparable harm is also likely. Defendants have informed Plaintiff that they consider him to have surrendered his clinical privileges while he is under investigation. (Dkt. No. 114-4 at 3.) Because Defendants accepted Plaintiff's purported surrender of his privileges, Defendants are required by law to file a report to the NPDB. 42 U.S.C. § 11133(a)(1)(B)(i). Defendants have indicated that they will file such a report by December 22, 2019. (Dkt. No. 114-4 at 4.) Thus, an adverse report—and the harm it will cause Plaintiff—is imminent.

Although Plaintiff is likely to suffer irreparable harm, there exists a comprehensive administrative scheme that could mitigate that harm. Under that scheme, Plaintiff can challenge Evergreen's report using the Department of Health and Human Services' (HHS) dispute process. *See* 45 C.F.R. § 60.21(c). That process might result in HHS requiring Evergreen to revise the report or instructing the NPDB to void the report. *See id.* The NPDB would then notify all queriers who received the previous version of the report within the past three years that the report has been changed or voided. *See id.*; U.S. Dep't of Health and Human Servs., NPDB Guidebook E-8 (2018). In addition, Evergreen would be required to void the report if the Court later overturns the suspension of Plaintiff's privileges, and all queriers would be notified that the

report was void. *See* NPDB Guidebook, *supra*, at E-8.

This administrative scheme lessens the harm that Plaintiff faces. However, the scheme could not undue completely the stigma that a report would cause. Nor would the scheme offer Plaintiff much help if he sought employment prior to Evergreen's report being changed or voided. Consequently, Plaintiff still faces irreparable harm.

### C. Balance of Equities

The balance of equities is mixed. To determine which way the balance of equities tips, a court must "identify the harms which a preliminary injunction might cause to defendants and . . . weigh these against plaintiff's threatened injury." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). Here, Plaintiff will suffer reputational harm if Evergreen files a report to the NPDB. Evergreen, on the other hand, could also suffer harm if it does not comply with its legal obligation to file a report. *See* 42 U.S.C. §§ 11111(b), 11133(a); *Doe*, 221 P.3d at 398 (Rice, J., dissenting). HHS might investigate Evergreen for failing to file a report. *See* 42 U.S.C. § 11111(b). The agency might then publish notice of Evergreen's noncompliance in the federal register. *See id.* And Evergreen could ultimately be stripped of its legal protections under 42 U.S.C. § 11111(a) for three years. *See id.* These are serious consequences.[2]

//

---

[2] Plaintiff cites *Walker v. Memorial Health System of East Texas*, 231 F. Supp. 3d 210, 217 (E.D. Tex. 2017), for the proposition that an injunction would excuse Evergreen from any legal obligation to file a report to the NPDB. (*See* Dkt. No. 111 at 16.) At issue in *Walker*, however, was whether a hospital had taken an action that was reportable. 231 F. Supp. 3d at 215–16. The hospital argued that if the court enjoined it from filing a report to the NPDB, then the hospital would have to violate federal law. *Id.* at 217. The court rightfully rejected this argument, concluding that "[i]t is the province of the federal courts—not the Hospital—to determine the requirements of . . . a federal statute." *Id.* Here, by contrast, there is no doubt that Evergreen must report a suspension (or surrender) of Plaintiff's privileges to the NPDB. *See* 42 U.S.C. § 11133(a)(1)(A)–(B). The question, then, is whether the Court can somehow excuse Evergreen's legal obligation to report if the Court concludes that the suspension is likely invalid. The Court is unaware of any basis on which it could do so. 42 U.S.C. § 11133(a) uses mandatory language, and it contains no exceptions.

### D.    Public interest

Like the balance of equities element, the public interest element is also mixed.

The Court begins with the strong presumption that the public interest weighs against granting an injunction. The Court does so because an injunction prohibiting a health care entity from complying with its congressionally-mandated reporting obligations threatens the balance that the HCQIA struck between the competing interests of the public and medical practitioners. *See* 42 U.S.C. § 11101(2). In weighing those interests, Congress concluded that the public would significantly benefit from a reporting requirement. Such a requirement, Congress stated in its legislative findings, would "restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." *See id.* But Congress recognized that a reporting requirement could harm physicians' reputations. To mitigate that harm, Congress authorized HHS to "promulgate by regulation . . . procedures in the case of disputed accuracy of information." 42 U.S.C. § 11136. HHS, in turn, "set out a comprehensive administrative scheme for challenging the accuracy of a report made to the NPDB." *Brown v. Med. Coll. of Ohio*, 79 F. Supp. 2d 840, 845 (N.D. Ohio 1999); *see* 45 C.F.R. § 60.21. This scheme, and the implicit judgments underlying it, show that it is ordinarily in the public interest for a court to allow a health care entity to file a report to the NPDB when the entity is statutorily obligated to do so. *See id.* (quoting *McGee v. United States*, 402 U.S. 479, 484 (1971)) ("Allowing a physician to bypass the administrative procedure simply by choosing to sue the reporting entity could 'induce frequent and deliberate flouting of the administrative processes, thereby undermining the scheme of decisionmaking that Congress has created' under the HCQIA.").

Plaintiff makes what appear to be two arguments for why the public interest weighs in favor of prohibiting Evergreen from filing a report to the NPDB. First, Plaintiff argues that the public is not served if Plaintiff's career is harmed while Evergreen's investigation is still ongoing. (*See* Dkt. No. 111 at 17–18.) Yet, Congress has concluded that the opposite is true: the

public benefits from hospitals reporting the suspension or surrender of a physician's privileges while the hospital investigates the physician. *See* 42 U.S.C. 11133(1)(A)–(B). The Court will not second-guess that legislative judgment. Second, Plaintiff argues that the public is not served by Evergreen filing a report "when . . . significant evidence demonstrates the hospital's pattern of acting in bad faith against [Plaintiff]." (*See* Dkt. No. 111 at 17–18.) This argument could have merit. For if it is true that Evergreen is planning to file a sham report, then the public would be harmed rather than helped by that report. However, Plaintiff bears the burden of showing that the report will likely be a sham. It is to that issue that the Court now turns.

### E. Success on the Merits

Plaintiff has not demonstrated that he is sufficiently likely to succeed on the merits so as to warrant an injunction that would interfere with the HCQIA's ordinary reporting process.

As an initial matter, Plaintiff does not clearly state which of his legal or equitable rights may have been violated by Evergreen's latest actions. (*See* Dkt. No. 111 at 18–21.) For example, Plaintiff argues that he has "at a minimum raised serious questions on the merits of his constitutional claims," (*id.* at 18), but he does not specify whether he believes that Evergreen's latest actions violated his First Amendment rights, due process rights, or both, (*see id.* at 18–21). Similarly, Plaintiff cites *Doe v. Community Medical Center, Inc.*, 221 P.3d 651, 661 (Mont. 2009), but he does not clarify if he is claiming, like the physician in *Doe*, that Evergreen breached its contract with him when it suspended his privileges following the recent death of his patient. (*See id.* at 19.) Plaintiff's lack of clarity places the Court in the uncomfortable position of having to make arguments on his behalf. It also weighs against granting an injunction because Plaintiff bears the burden of demonstrating a likelihood of success on the merits. *See L.A. Mem'l Coliseum Comm'n*, 634 F.2d at 1203.

Because of Plaintiff's lack of clarity, the Court will limit its analysis to what appears to be Plaintiff's central claim: "that Defendants have engaged in a years-long campaign of retaliation against [Plaintiff], and this act is a continuation of this campaign." (*See* Dkt. No. 111

at 20.) In analyzing that claim, the Court will consider separately Evergreen's actions regarding the death of Plaintiff's patient and Evergreen's actions regarding his 2018 cases.

### 1.   Evergreen's Actions Regarding the Death of Plaintiff's Patient

At this juncture, there is strong evidence that Evergreen acted in good faith when it responded to the recent death of Plaintiff's patient. As detailed in Dr. Ettore Palazzo's declaration, several doctors and medical staff had genuine concerns over Plaintiff's decisionmaking during the patient's treatment. (*See* Dkt. No. 87 at 4–8.) Those concerns were shared by the numerous other physicians and surgeons who attended the *ad hoc* quality peer review meeting with Plaintiff on November 5, 2019. (*Id.* at 9.) And those concerns were reflected in the MEC's letter explaining the MEC's decision to suspend Plaintiff's privileges. (*See* Dkt. No. 114-4 at 3.) That letter states, "In short, you selected a less than optimal procedure, opted for observational post-surgical monitoring, and did not appropriately react to the information gathered throughout that monitoring." (*Id.*)

Plaintiff has offered little evidence to show that the letter's words, which mirrored the judgments of many qualified doctors at Evergreen, were mere pretext. To establish pretext, Plaintiff primarily relies on the declarations of Dr. Charles Cobbs and Dr. Richard Wohns, (*see* Dkt. No. 111 at 19), who both reviewed medical records relating to the patient's death, (Dkt. Nos. 112 at 2, 113 at 2).[3] These declarations, which describe the doctors' conclusions only in general terms, raise questions about whether Plaintiff provided adequate care to the patient and whether Evergreen made the correct decision when it suspended Plaintiff's privileges. (*See* Dkt. Nos. 112 at 3–4, 113 at 3.) But the issue here is not whether Evergreen made the correct decision. The issue is whether Evergreen made the decision in bad faith. The fact that the

---

[3] Plaintiff also argues that Evergreen's bad faith is evidenced by Dr. Lee's presence at the *ad hoc* meeting. (Dkt. No. 111 at 19.) Yet, the meeting was also attended by numerous other doctors and physicians who were concerned enough with Plaintiff's behavior that they recommended an investigation. (*See* Dkt. No. 87 at 9.) Consequently, Dr. Lee's presence is, at most, weak evidence of bad faith.

decision might have been wrong is evidence of bad faith, but it is not strong enough evidence to warrant a preliminary injunction.

### 2. Evergreen's Actions Regarding the 2018 Cases

Plaintiff also offers the Court little concrete evidence to show that Evergreen acted in bad faith when it relied on the 2018 cases to suspend his privileges. When one reads the QPRC's unanimous recommendation to not renew Plaintiff's privileges, one is struck by the seriousness of the allegations contained therein. (*See* Dkt. No. 115-4 at 2–4.) Among other things, the QPRC alleges that Plaintiff engaged in practices that are unsupported by the literature; that he is "unwilling[] to adapt his practice to modern, accepted techniques"; that several of his cases in 2018 deviated from the standard of care; and that he has serious issues collaborating with other Evergreen employees, including "ignoring, cancelling or superseding the judgments and orders of hospitalists and intensivists, even when the decision is clearly within their professional expertise (and not his)." (*Id.* at 4.) To rebut these allegations, Plaintiff offers conclusory statements with no supporting citations. The following excerpt from Plaintiff's motion is illustrative:

> The January 2019 termination was not reported to the NPDB only because the state court quickly enjoined it before it could reach 30 days. Dkt. No. 20-12. That termination—the first of any credentialed provider at Evergreen in at least a dozen years—was based explicitly on absurd pretextual concerns such as [Plaintiff's] "optimistic" prognoses (which, as Dr. O'Callaghan has since acknowledged, have often been correct), his willingness to "contradict" other clinicians, and cases with excellent clinical outcomes and highly satisfied patients. Then, in October 2019, the QPRC again recommended termination of [Plaintiff's] privileges based on the CAP cases—which, again, involved only positive clinical outcomes. Naini Decl., Ex. 3.

(Dkt. No. 111 at 20.) This type of argument does not show that a jury will likely conclude that the QPRC's and MEC's decisions were nothing more than a sham. The Court therefore declines to grant Plaintiff the "extraordinary remedy" that is a temporary restraining order.

## III. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for a temporary

restraining order (Dkt. No. 111).

DATED this 20th day of December 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE