1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9  ALI J. NAINI,                                    CASE NO. C19-0886-JCC

10                        Plaintiff,                ORDER

11           v.

12  KING COUNTY PUBLIC HOSPITAL
    DISTRICT NO. 2 d/b/a EVERGREEN
13  HOSPITAL MEDICAL CENTER *et al.*,

14                        Defendants.

15

16          This matter comes before the Court on Defendants' motion for partial summary judgment

17  (Dkt. No. 80). Having considered the parties' briefing and the relevant record, the Court hereby

18  GRANTS the motion in part and DENIES the motion in part for the reasons explained herein.

19  **I.      BACKGROUND**

20          In 2012, Plaintiff Dr. Ali Naini and Defendant Dr. Melissa Lee spoke with one another in

21  an office on the Intensive Care Unit of Defendant King County Public Hospital District No. 2

22  ("Evergreen"). (Dkt. Nos. 82-7 at 2, 82-8 at 2.) Plaintiff and Dr. Lee disagree about what was

23  said, who started the conversation, and what transpired. (*Compare* Dkt. Nos. 82-7 at 2–3, *with*

24  82-8 at 2–3.) Plaintiff accuses Dr. Lee of forcefully grabbing and threatening to "crucify" him

25  because he advised a patient's family that patients receive a lower level of care in the ICU if they

26  are designated "Do Not Resuscitate." (*See* Dkt. No. 82-7 at 2–3.) Dr. Lee denies forcefully

grabbing Plaintiff or threatening to crucify him, but she agrees that she told Plaintiff that she found his comments to his patient's family insulting. (*See* Dkt. No. 82-8 at 2–3.) Dr. Lee also remembers raising concerns over Plaintiff's alleged tendency to make critical care decisions about a patient without discussing those changes with ICU staff. (*See id.* at 2.)

Following Plaintiff and Dr. Lee's contested meeting in 2012, the two doctors engaged in a series of discussions with other Evergreen physicians and staff members about communication issues in the ICU. (*See* Dkt. Nos. 97-7 at 2, 97-14 at 2–3, 97-15 at 2–4, 97-16 at 2–5). During those discussions, Plaintiff complained that ICU staff were overriding and changing his neurosurgical orders without talking to him first. (*See* Dkt. Nos. 97-12 at 3, 97-16 at 2.) Dr. Lee, on the other hand, felt that Plaintiff was ignoring the expertise of ICU team members and was making improper unilateral decisions about ICU patients. (*See* Dkt. No. 82-8 at 2.) She therefore drafted "Neurosurgical Management Guidelines" designed to require Plaintiff to include ICU team members in certain conversations with patients and in specific decisions about patient care. (*See* Dkt. No. 97-15 at 2–3.) Those guidelines were eventually implemented in 2016. (Dkt. No. 97-17 at 2–4.)

On June 16, 2016, Dr. Lee contacted Defendant Dr. Robert Geise, then-president of Evergreen's medical staff, about "two patient interactions with [Plaintiff]" and about Plaintiff "blatantly breaking" the new guidelines. (Dkt. No. 97-18 at 2.) Five days later, Dr. Geise contacted Plaintiff to arrange a meeting about what happened with the patients and any concerns Plaintiff had with patient care. (*See* Dkt. No. 82-11 at 2–3.) Plaintiff subsequently sent Dr. Geise an email summarizing their conversation. (Dkt. No. 82-12 at 2.) Plaintiff's email emphasized two points of discussion: (1) Plaintiff's concern that ICU team members were having DNR discussions without the attending physician present and (2) how to resolve differences of opinion between the attending physician and ICU team members. (*See id.* at 2–3.)

Dr. Geise also summarized the meeting in an email to medical staff officers. (*See* Dkt. No. 82-14 at 2–3.) In that email, Dr. Geise expressed his concern that "[Plaintiff] is clearly

stepping outside his area of expertise and lacks insight in several areas." (*Id.* at 2.) Dr. Geise also observed that "[t]here is a highly antagonistic relationship between [Plaintiff] and almost all the critical care and hospitalist doctors which is compromising patient management." (*Id.*) Given those concerns, Dr. Geise recommended further discussions about whether "we need to consider a[] [Focused Professional Practitioner Evaluation ("FPPE-C")] for [Plaintiff] with regards to co-management of critically ill patients with co-morbities." (*Id.* at 3) A few days later, Dr. Scott Burks circulated a draft FPPE-C to other medical staff officers. (*See* Dkt. No. 82-15 at 2–3.)

On June 28, 2016, Dr. Geise met with ICU physicians and staff members to discuss issues about Plaintiff "from [a] Hospitalist/Intensivist viewpoint." (*See* Dkt. No. 82-16 at 2–3.) During the meeting, ICU staff members alleged that Plaintiff "will paint a rosy picture to the family and try to convince them that DNR status is not the way to go." (*Id.* at 3.) Dr. Lee was even more forceful, stating that the hospitalists and intensivists felt disrespected and frustrated, that Plaintiff was a "dangerous provider," and that "she want[ed] to hear from medical staff leadership . . . that there will be a plan." (*Id.* at 2–3.) In response to Dr. Lee's comments, Dr. Geise "affirmed that he ha[d] a plan for formal review." (*Id.* at 2.)

Dr. Geise articulated his plan in an email to physicians and the medical staff office. (*See* Dkt. No. 82-17 at 2.) Dr. Geise's email called for the "assembl[y] [of] a multidisciplinary group of providers [to] review a series of [Plaintiff's] cases that have been brought up as being highly concerning." (*Id.*) According to Dr. Geise, a review of Plaintiff's cases was warranted because Plaintiff had demonstrated a "recurring pattern of clinical judgment and behavior that is potentially compromising patient safety and care." (*Id.*)

On July 13, 2016, an *ad hoc* committee met to review four of Plaintiff's cases. (Dkt. No. 82-18 at 2–7.) The committee then sent three of the cases to an external reviewer. (*See generally* Dkt. No. 82-20.) Before the external reviewer issued a report, however, Plaintiff met with Dr. Geise and others to discuss "1.) Documentation in the medical record. 2.) Communication within the patient care team. 3.) Clinical judgment." (Dkt. No. 97-32 at 2.) At the meeting, Plaintiff was

told that Evergreen was working on developing an FPPE-C. (*Id.*) The FFPE-C, Dr. Geise emphasized, was "meant to be educational to help providers improve, not punitive." (*Id.*) Yet Dr. Geise also described the situation as a "wakeup call" and expressed his desire to "help [Plaintiff] get back on track." (*Id.* at 3.) Plaintiff responded that "[h]e di[dn't] feel that the three cases were managed well in the ICU" and that "patients are dying that do not need to die." (*Id.*) Plaintiff also agreed to voluntarily refrain from certain clinical activities until Evergreen's Medical Executive Committee ("MEC") had received and evaluated the results of the external review. (*Id.* at 2.)

The external reviewer eventually issued a report in August 2016. (*See generally* Dkt. No. 82-20.) That report was subsequently sent to the MEC, which voted to pursue an FPPE-C for Plaintiff. (Dkt. Nos. 82-22 at 2–4, 82-23 at 2.) The FPPE-C was designed to monitor Plaintiff's "[c]ommunication and interaction style," "[d]ocumentation of daily evaluation, care and decision making process," "[c]ompliance with Neurosurgery Management Guidelines in [the] ICU," and "[m]aintenance of knowledge of current practices." (Dkt. No. 82-23 at 2.)

Over the next year, Plaintiff's medical staff privileges started to come under threat. On April 3, 2017, for example, Dr. Geise sent a letter to Plaintiff informing him that the medical staff officers were recommending to the MEC that he undergo a competency assessment at the University of California, San Diego at his own expense. (*See* Dkt. No. 97-33 at 2.) "Failure to complete the competency assessment within 6 months," the letter warned, "will result in automatic termination of your membership and privileges as a member of the EvergreenHealth Medical Staff." (*Id.*) Then in June 2017, Dr. Geise sent a letter to Plaintiff alleging that Plaintiff had violated the neurosurgical ICU co-management agreement when he (1) "had discussions about prognosis with [a] patient's family without consulting the intensivist or neurologist" and (2) "arranged to have a family conference at [his] office with the family in order, apparently, to avoid involvement of the intensivist or neurologist." (Dkt. No. 97-34 at 2.) The letter told Plaintiff that his privileges could be summarily suspended if he did not "immediately comply with the ICU co-management in every respect." (*Id.* at 3.)

During this same period, Dr. Lee continued to voice concerns about Plaintiff. In an August 2017 email addressed to the medical staff and Dr. Jeff Tomlin, Dr. Lee wrote regarding one of Plaintiff's recent cases, "I am formally stating that in my professional opinion as ICU Medical and QI Director, [Plaintiff] is not safe to be managing critically ill patients at Evergreen Healthcare." (Dkt. No. 97-36 at 4) (emphasis omitted). Dr. Geise forwarded the email to Defendant Dr. James O'Callaghan and Dr. Burks, asking, "Have we reached a tipping point?" (*Id.* at 2.) Dr. O'Callaghan responded, "Yup." (*Id.*)

Litigation in this case commenced on October 25, 2017, when Plaintiff filed a complaint in King County Superior Court. (Dkt. No. 11-1.) In that complaint, Plaintiff sought to prevent Defendants from revoking his hospital privileges if he did not complete the competency assessment at the University of California, San Diego. (*Id.* at 3.) In response to Plaintiff's complaint, Evergreen agreed to withdraw, "without prejudice," the FPPE-C requiring Plaintiff to complete the competency assessment. (*See* Dkt. No. 12-8 at 8.)

Although Evergreen withdrew the competency assessment requirement, the MEC soon voted to institute a Corrective Action Plan ("CAP") for Plaintiff to "address the area of communication and assess clinical competency." (Dkt. No. 97-38 at 2.) Under the CAP, Plaintiff's 2018 cases were to be evaluated if they met certain criteria. (*See id.* at 4–5.)

While the CAP was ongoing, Plaintiff submitted his reapplication for two years of medical staff privileges at Evergreen. (Dkt. No. 18-12 at 18–52.) The Credentials Committee ("CC") and MEC considered Plaintiff's reapplication, and on October 16, 2018, Dr. O'Callaghan sent Plaintiff a letter notifying Plaintiff that the CC and MEC were not prepared to extend his privileges for two years "[d]ue to an ongoing investigation regarding concerns of professional competence and professional conduct." (*See* Dkt. No. 82-36 at 2.) Instead, the CC and MEC "approved [Plaintiff's] reappointment for three months." (*Id.*) According to the letter, that reappointment was "effective from 10/16/2018 12:00:00 AM through 01/15/2019." (*Id.*)

On January 9, 2019, the CC met and voted unanimously to recommend that the Board not

renew Plaintiff's privileges. (Dkt. No. 82-38 at 3.) Dr. O'Callaghan attended the meeting and voted along with 10 other members of the committee; Dr. Geise recused himself and did not attend. (*Id.* at 2–3.) One day after the CC's vote, Dr. Kevin Hansen, chair of the CC, allegedly called Plaintiff and informed him of the CC's recommendation. (Dkt. No. 97-58 at 2.) According to Plaintiff, Dr. Hanson assured Plaintiff that he could continue practicing at Evergreen until both the MEC and Evergreen's Board of Commissioners approved the CC's recommendation. (*Id.*) The MEC—including Dr. O'Callaghan—unanimously approved the recommendation on January 14, 2019. (Dkt. No. 82-40 at 3.)

What happened next is vigorously disputed by the parties. Plaintiff claims that the Board voted to not renew his privileges on January 15, 2019. (Dkt. No. 95 at 13.) Defendants claim that no vote occurred and that Plaintiff's privileges naturally expired. (Dkt. No. 80 at 10–11.) What is undisputed, however, is that on January 17, 2019, Dr. O'Callaghan called Plaintiff and told Plaintiff that he was "no longer on staff" because the Board had approved the MEC's recommendation to not renew his privileges. (Dkt. Nos. 97-48 at 53–55, 97-54 at 2.) Five days later, Plaintiff filed a motion for a preliminary injunction, asking the Superior Court to "prohibit[] any interference with his exercise of privileges at EvergreenHealth." (Dkt. No. 14-26 at 26.) The Superior Court found that there was "no question on this record that the hospital ha[d] taken adverse action against [Plaintiff] by completely suspending his privileges without any advance hearing." (*See* Dkt. No. 32-1 at 60.) That summary "suspension," the Superior Court concluded, had likely denied Plaintiff due process and violated Evergreen's bylaws. (*Id.* at 60–61; *see also* Dkt. No. 16-13 at 4.) The Superior Court therefore vacated Plaintiff's "suspension" and issued a preliminary injunction preventing Defendants from "[t]aking any action that prevents, prohibits, or interferes with plaintiff's exercise of privileges and prerogatives as an active staff member of the EvergreenHealth Medical Center." (Dkt. No. 16-13 at 4.)

Plaintiff subsequently amended his complaint to add claims for damages against Dr.

Geise, Dr. O'Callaghan, Dr. Lee, EvergreenHealthMedical Center Medical Staff, and Evergreen. (Dkt. No. 28 at 41–49.) Because Plaintiff's amended complaint included federal claims under 42 U.S.C. §§ 1983 and 1985(3), Defendants removed the case to this Court. (Dkt. No. 2.) Defendants now move for summary judgment dismissal of Plaintiff's §§ 1983 and 1985(3) claims.[1] (*See* Dkt. No. 80 at 14–26 & n.9.)

## II.     DISCUSSION

### A.     Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In deciding whether there is a genuine dispute of material fact, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Id.* at 255. The Court is therefore prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

---

[1] Defendants also ask the Court to "enter an order finding that claims or damages preceding June 2016 are time barred pursuant to the applicable three-year statute of limitations." (Dkt. No. 80 at 25.) But Defendants do not point to any of Plaintiff's claims that would be barred. The Court will not prospectively decide a legal issue unless and until that issue becomes relevant.

party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B.      Plaintiff's § 1983 Procedural Due Process Claim Against Evergreen**

42 U.S.C. § 1983 provides a cause of action against persons who (1) under color of state law or custom (2) subject, or cause to be subjected, any person to (3) the deprivation of any rights, privileges, or immunities secured by the Constitution or the laws of the United States. Defendants ask the Court to dismiss Plaintiff's § 1983 procedural due process claim against Evergreen on two grounds. First, Defendants contend that Evergreen did not "cause" a violation of Plaintiff's due process rights because its Board of Commissioners—the body with final authority regarding physician privileges—did not take final policy action to deprive Plaintiff of his privileges. (*See* Dkt. No. 80 at 18.) Second, Defendants argue that regardless of whether Evergreen took final policy action, Evergreen did not deprive Plaintiff of his due process rights because it provided him with adequate procedural protections. (*See id.* at 19–20.) The Court concludes that genuine issues of material fact preclude summary judgment on the first ground and that the parties' inadequate briefing precludes summary judgment on the second ground.

1.      Causation

Section 1983 does not render a municipal entity vicariously liable for the acts of its employees; the entity must "cause" the plaintiff's injury. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Tanner v. Heise*, 879 F.2d 572, 582 (9th Cir. 1989). A municipal entity can cause a plaintiff's injury in "one of three ways." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). First, the entity's employee might commit a constitutional violation while acting pursuant to the entity's policy, practice, or custom. *Id.* Second, an employee (or decision-making body) endowed with "final policy-making" authority might violate the plaintiff's rights in such a way that the employee's action constitutes an act of official governmental policy. *Id.* Third, "an official with final policy-making authority [might] ratif[y] a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 1346–47.

In this case, Plaintiff offers several pieces of evidence to show that the Board took final

policy action against his privileges at a Board meeting on January 15, 2019. The day after the Board met, the CC held its own meeting. (Dkt. No. 97-53 at 3–4.) The minutes from that meeting state that Plaintiff was "no longer on staff" because "Credential Committee and MEC did not recommend reappointment" and because "Board of Commissioners did not reverse that decision." (*Id.*) One day after the CC meeting, Dr. O'Callaghan told Plaintiff that he was "no longer on staff" because the Board had approved the MEC's recommendation to not renew Plaintiff's privileges. (Dkt. Nos. 97-48 at 53–55, 97-54 at 2.) That same day, Evergreen's medical staff coordinator sent an email containing the subject line "Board Approvals" and stating Plaintiff was "no longer on staff." (Dkt. No. 97-55 at 2.) And almost one month later, Dr. O'Callaghan reported to the MEC that "[d]ue to the ongoing lawsuit, Court has overturned the CC/MEC/Board approval, not to reappoint [Plaintiff] to staff."[2] (Dkt. No. 103-2 at 3.)

Defendants contend that these meeting minutes and other communications are the product of misunderstandings, imprecise phrasings, or both. (*See* Dkt. No. 80 at 10–11, 16.) According to Frederick Allison DeYoung, chairman of the Board, the Board was informed of but did not vote on the MEC's recommendation to not renew Plaintiff's privileges. (Dkt. No. 81 at 2–3.) Dr. O'Callaghan supports Mr. DeYoung's version of events, stating in a deposition that he "misstated"—to multiple people—"what had happened at the board meeting." (Dkt. No. 97-48 at 53.) In this telling of what happened, the Board did not take any action regarding Plaintiff's privileges; his privileges naturally "expired" on January 15, 2019, when his three-month reappointment ended without the Board having come to a final decision. (*See* Dkt. No. 80 at 11) (citing Dkt. No. 82-36 at 2).

Defendants provide a plausible alternative account of what happened—an alternative

---

[2] Plaintiff did not cite the MEC meeting minutes from February 2019 in his response because Defendants did not produce the minutes until two days after Plaintiff's deadline to submit his response. (*See* Dkt. No. 102 at 1–2.) The Court finds good cause to consider those meeting minutes in deciding whether to grant summary judgment. Accordingly, the Court GRANTS Plaintiff's motion to supplement the summary judgment record (Dkt. No. 102).

account that a jury might ultimately believe. A jury could conclude, for example, that the CC was misinformed about what took place at the January 15 Board meeting; that Evergreen's medical staff coordinator was erroneously told that the Board had approved a change in Plaintiff's employment status; that the minutes of the MEC meeting in February incorrectly referred to the "Board approval, not to reappoint [Plaintiff] to staff"; and that Dr. O'Callaghan's January 17 letter to Plaintiff, which states that the Board had not yet made a final decision, (*see* Dkt. No. 82-42 at 3–4), is more accurate than what Dr. O'Callaghan told Plaintiff over the phone that very same day, (*see* Dkt. Nos. 97-48 at 53–55, 97-54 at 2). But to obtain summary judgment, Defendants must do more than provide a plausible alternative account; they must show that no reasonable jury could believe Plaintiff's version of events. *See Anderson*, 477 U.S. at 248–49. Defendants have not carried their burden. Instead, Defendants ask the Court to improperly weigh the evidence and resolve disputed issues in their favor. Weighing evidence and resolving disputed issues is a task for the jury, not the Court. *See Tolan*, 572 U.S. at 657–58.

2.   Procedural Protections

Defendants argue that even if Evergreen took final policy action, it did not violate Plaintiff's due process rights because it provided him with adequate procedural protections. (*See* Dkt No. 80 at 19–20.) Unfortunately, the Court cannot determine the procedural protections to which Plaintiff was entitled because the parties have failed to discuss the nature of Plaintiff's property interest in the renewal of his medical staff privileges.

The principles governing a procedural due process claim are simple to state. To succeed on such a claim, a plaintiff must show (1) they possessed a constitutionally protected liberty or property interest and (2) the defendant deprived them of that interest without affording adequate procedural protections. *Brewster v. Bd. of Educ.*, 149 F.3d 971, 982 (9th Cir. 1998). When the claim involves a property interest, the first element is met if the plaintiff had a "legitimate claim of entitlement" to the property interest. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). The second element is met if the defendant afforded procedural protections that were inadequate

given the following three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Although these principles are easy to state, they can be difficult and fact-intensive to apply. To decide if a plaintiff has a property interest in continued employment, for example, a court usually must examine the text of the plaintiff's employment contract. *See Jago v. Van Curen*, 454 U.S. 14, 17–18 (1981) ("Principles of contract law naturally serve as useful guides in determining whether or not a constitutionally protected property interest exists."). But looking at a contract's text is often not enough: in some cases, a property interest is impliedly created even though it is not explicitly contained in an employment contract. *See id.* (citing *Perry v. Sindermann*, 408 U.S. 593, 601–02 (1972); *Bishop v. Wood*, 426 U.S. 341, 344 (1976)). And if a court decides that a plaintiff has a constitutionally protected property interest, it must look to the nature of the property interest to determine if the defendant afforded the plaintiff adequate procedural safeguards prior to depriving the plaintiff of that interest. *See Brewster*, 149 F.3d at 983. That determination is invariably case-specific because "'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place, and circumstances.'" *Mathews*, 424 U.S. at 334 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)).

In this case, the parties largely ignore whether Plaintiff had a constitutionally protected interest in the renewal of his privileges. Defendants, on the one hand, assume "[f]or purposes of this motion only . . . that Plaintiff's medical staff privileges are a constitutionally protected interest." (Dkt. No. 80 at 17.) Plaintiff, on the other hand, briefly argues that he has a "constitutionally protected interest in his medical staff privileges," but he does not discuss

whether he had an interest in the *renewal* of those privileges. (*See* Dkt. No. 95 at 16–17 & n.4.) That distinction is important because the "mere fact a person has received a government benefit in the past, even for a considerable length of time, does not, without more, rise to the level of a legitimate claim of entitlement." *Doran v. Houle*, 721 F.2d 1182, 1186 (9th Cir. 1983). Accordingly, a person likely lacks a property interest in the renewal of their hospital privileges "if the reviewing body has discretion to deny renewal or impose . . . criteria of its own creation." *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1164–65 (9th Cir. 2005) (citing *Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980)). Conversely, a person may possess a property interest in the renewal of their privileges if the reviewing body's decision is substantively constrained by a contract or custom between the parties. *See id.* at 1164–65 & n.2. Unfortunately, neither Plaintiff nor Defendants address whether there were substantive constraints on the Board's decision to renew Plaintiff's privileges.

Because the parties fail to address whether Plaintiff had a constitutionally protected interest in the renewal of his privileges, it is difficult for the Court to determine if Evergreen afforded Plaintiff adequate procedural protections. Take the risk-of-erroneous-deprivation factor as an example. In cases where courts have held that pre-deprivation process was needed to avoid an erroneous deprivation of a physician's privileges, those courts focused on how pre-deprivation process would improve the hospitals' decision-making. *See Osuagwu v. Gila Reg'l Med. Ctr.*, 938 F. Supp. 2d 1142, 1159–61 (D.N.M. 2012); *Dr. Marin v. Citizens Mem'l Hosp.*, 1985 WL 6001, slip op. at 1 (S.D. Tex. 1985) ("[P]rocedural due process must be afforded an applicant so that he may explain or show to be untrue those matters which might lead the board to reject his application."). Yet here, the parties have failed to discuss the nature of the decision that the Board had to make before it declined to renew Plaintiff's privileges. Was the Board required to find "good cause" for not renewing Plaintiff's privileges? If so, then pre-deprivation process would likely be valuable. *See Osuagwu*, 938 F. Supp. 2d at 1148, 1159–61. If not, then pre-deprivation process would have less value.

Absent briefing that addresses the nature of Plaintiff's property interest in the renewal of his privileges, it is inappropriate for the Court to decide the level of process that Evergreen had to provide Plaintiff prior to not renewing his privileges. Any future briefing on the issue should focus on the nature of Plaintiff's property interest in the renewal of his privileges and the nature of the decision the Board had to make when deciding whether to renew his privileges.

## C. Plaintiff's § 1983 Procedural Due Process Claims Against the Individual Defendants

Defendants move for summary judgment dismissal of Plaintiff's § 1983 procedural due process claims against the individual Defendants on two grounds. First, Defendants argue that those Defendants did not "cause" Plaintiff to lose his privileges without due process. (*See* Dkt. No. 80 at 15–17.) Second, Defendants contend that even if the individual Defendants "caused" Plaintiff's constitutional injury, those Defendants are entitled to qualified immunity. (*Id.* at 23–25.) The Court concludes that genuine issues of material fact preclude summary judgment on the first ground and that the Court would need additional briefing to decide the second issue.

### 1. Causation

Section 1983's causation requirement is met if an individual "does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). "[P]ersonal participation is not the only predicate for § 1983 liability," *id.*, however, because § 1983's causation requirement is "read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)). Those background principles also render a person liable under § 1983 if the person "sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." *Preschooler II v. Clark Cty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Duffy*, 588 F.2d at 743).

Contrary to Defendants' assertion, (*see* Dkt. No. 80 at 16–17), these causation principles do not require that a person be a voting member of a board for the person to be liable for the board's decision. Such a requirement would contradict the plethora of cases holding that a subordinate government employee is liable under § 1983 for the decision of a superior if the subordinate causes the superior to make the decision. *See, e.g.*, *Strahan v. Kirkland*, 287 F.3d 821, 826 (9th Cir. 2002) (quoting *Gilbrook v. City of Westminster*, 177 F.3d 839, 854–55 (9th Cir. 1999)) ("Even if the ultimate decision-maker can establish that the adverse action was not in retaliation for protected conduct, a subordinate with a retaliatory motive can be liable 'if an improper motive sets in motion the events that lead to termination that would not otherwise occur.'"); *see also Smith v. Bray*, 681 F.3d 888, 898 (7th Cir. 2012) (collecting cases). Those cases draw no distinction between decisions made by a single actor and decisions made by a board comprised of multiple actors. *See Prof'l Ass'n of College Educators v. El Paso Cty. Cmty. Coll. Dist.*, 730 F.2d 258, 266 (5th Cir. 1984) (upholding § 1983 claim against college president where the president recommended that the board of trustees discharge faculty members and the board followed that recommendation). The question is ultimately one of causation, and a person can "cause" a board to act even if the person is not a voting member of the board.[3]

Although it is possible for a person to cause a board to deprive someone of their constitutional rights, Plaintiff's procedural due process claims against the individual Defendants present unique causation issues. To succeed on those claims, Plaintiff must do more than show

---

[3] *Chudacoff v. University Medical Center of Southern Nevada*, 649 F.3d 1143 (9th Cir. 2011), is not to the contrary. In that case, the Ninth Circuit held that voting members of a county hospital's medical executive committee could be liable for the plaintiff's constitutional injuries while a non-voting member was not liable. *See Chudacoff*, 649 F.3d at 1151–52. In so holding, the Ninth Circuit did not announce a bright-line rule that a person must be a voting member of a decision-making body to be liable for the body's decision. *See id.* The Ninth Circuit instead held that the individual defendant's "*mere* non-voting membership," absent any additional facts, was "insufficient to show that she was an 'integral participant' in the deprivation of [the plaintiff's] rights." *See id.* at 1151 (emphasis added) (quoting *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004)).

that the individual Defendants caused the Board to not renew his privileges; he must show that they caused the Board to not renew his privileges *without due process*. Moreover, given that the individual Defendants did not directly participate in the Board's decision, (*see* Dkt. No. 80 at 16–17), Plaintiff must demonstrate that they knew or reasonably should have known that their actions would cause the Board to deny him due process. *See Preschooler II*, 479 F.3d at 1183 (quoting *Duffy*, 588 F.2d at 743).

As far as the Court can tell, the parties do not discuss whether it was foreseeable that the Board would deny Plaintiff due process. Instead, the parties focus their briefing on the distinct issue of whether the individual Defendants caused the Board to not renew Plaintiff's privileges. (*See* Dkt. Nos. 80 at 15–17, 95 at 24–25.) The Court will therefore limit its analysis to that issue, and it will analyze each individual Defendant's role in the Board's decision separately while keeping in mind that "causation is preeminently a question of fact, to be decided after trial." *Tahoe Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 34 F.3d 753, 756 (9th Cir. 1994).

### i.    Dr. Lee

There are several reasons why a reasonable jury could conclude that Dr. Lee caused the Board to not renew Plaintiff's privileges. First, the evidence shows that Dr. Lee played an essential role in creating co-management guidelines that targeted Plaintiff and contributed to his loss of privileges: she pushed for the guidelines to be adopted as early as 2013, (*see* Dkt. No. 97–15 at 2); she continued to work on the guidelines until they were adopted, (*see* Dkt. Nos. 97-14 at 2–3, 16 at 2–3); she linked those guidelines to Plaintiff's fitness as a doctor, (*see* Dkt. No. 97-22 at 3) ("Dr. Lee stated that the fact that a co-management agreement is needed for this physician is very concerning. Should he be allowed to admit patients to the ICU?"); and Dr. Geise cited Plaintiff's failure to abide by the guidelines as a basis for the CC's recommendation to not renew Plaintiff's privileges, (Dkt. No. 97-59 at 2). Second, Dr. Lee had a hand in launching the formal review process that led to the Board's decision; indeed, Dr. Lee describes herself as having had

to "threaten" Evergreen's president to come up with a "plan" that would lead to "change." (*See* Dkt. Nos. 97-22 at 3, 97-23 at 2.) Finally, Dr. Lee continued to involve herself in Plaintiff's review process once it began. (*See* Dkt. Nos. 97-25 at 2, 97-36 at 4.) In August 2017, for example, Dr. Lee sent an email to Dr. Geise and others stating, "I want to make sure you know that after a thorough evaluation of [Plaintiff's] recent case in the ICU: I am formally stating that in my professional opinion as ICU Medical and QI Director, [Plaintiff] is not safe to be managing critically ill patients at Evergreen Healthcare." (Dkt. No. 97-36 at 4) (emphasis omitted).

### ii. Dr. Geise

A reasonable jury could also conclude that Dr. Geise caused the Board to not renew Plaintiff's privileges. When read in the light most favorable to Plaintiff, the evidence shows that Dr. Geise set into motion the review process that ultimately led to Plaintiff losing his privileges. (*See* Dkt. Nos. 97-22 at 3, 97-24 at 2.) In addition, the evidence shows that Dr. Geise may have wanted Plaintiff to lose his privileges, given that Dr. Geise identified the FPPE-C plan, (*see* Dkt. No. 97-26 at 7), threatened to terminate Plaintiff's privileges when he was "out of compliance" with the competency-assessment portion of the plan, (*see* Dkt. No. 97-37 at 2), and replaced the plan with the CAP after Evergreen withdrew the competency assessment in the face of Plaintiff's lawsuit, (*see* Dkt. No. 97-38 at 2).

### iii. Dr. O'Callaghan

A reasonable jury could further conclude that Dr. O'Callaghan caused the Board to not renew Plaintiff's privileges. This is true for several reasons. First, Dr. O'Callaghan sat on the CC and voted to recommend that the Board not renew Plaintiff's privileges. (*See* Dkt. No. 97-50 at 2.) Second, Dr. O'Callaghan wrote a report summarizing the CC's recommendation. (Dkt. Nos. 97-48 at 17–18, 97-59 at 2.) Apparently, the CC neither created nor approved Dr. O'Callaghan's report. (*See* Dkt. No. 97-47 at 7–8.) That report could therefore be viewed as a product of Dr. O'Callaghan's own making, and a reasonable jury could hold Dr. O'Callaghan responsible for

whatever influence the report may have had on the Board's decision. Third, Dr. O'Callaghan chaired the MEC meeting that adopted the CC's recommendation. (Dkt. No. 97-51 at 2.)

## 2. Qualified Immunity

Defendants also move for summary judgment dismissal of Plaintiff's § 1983 claims against the individual Defendants on the ground that those Defendants are entitled to qualified immunity. (*See* Dkt. No. 80 at 23–25.) The Supreme Court has emphasized "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Here, however, the Court is unable to resolve the qualified immunity issue because it cannot determine whether the individual Defendants violated a "clearly established" right unless it receives proper briefing about the nature of Plaintiff's property interest. *See Pearson v. Callaghan*, 555 U.S. 223, 232 (2009); *supra* Section II.B.2.

## D. Plaintiff's § 1983 First Amendment Retaliation Claims

Defendants also move for summary judgment dismissal of Plaintiff's § 1983 First Amendment retaliation claims. (Dkt. No. 80 at 21–23.) A First Amendment retaliation claim involves five distinct questions:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). Ordinarily, these five questions are answered communication-by-communication, with the plaintiff identifying a specific communication—a questionnaire distributed to coworkers, for example—and the court determining if the defendant violated the First Amendment by retaliating against the plaintiff because of that communication. *See Connick v. Meyers*, 461 U.S. 138, 140–41, 148–54 (1983). Taking a communication-by-communication approach is difficult in this case, however, because Plaintiff claims that Defendants retaliated against him for speech that occurred over a six-year

period and that varied in content, form, and context. (*See* Dkt. No. 95 at 21–24.) Given the unique nature of Plaintiff's claim, the Court will forgo a communication-by-communication approach and will instead analyze what it sees as two different categories of communications: Plaintiff's communications with Evergreen employees and Plaintiff's communications with his patients.

### 1. Plaintiff's Communications with Evergreen Employees

The Court will first analyze Plaintiff's communications with Evergreen employees. Defendants argue that those communications did not address an issue of public concern, and the Court agrees. (*See* Dkt. No. 80 at 21–22.)

"[P]ublic employees do not lose their rights as citizens to participate in public affairs by virtue of their government employment." *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 977 (9th Cir. 2002). At the same time, government officials "should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick*, 461 U.S. at 146. The competing interests between government officials and public employees are balanced, in part, by the requirement in retaliation cases that an employee's speech involve a matter of public concern. *See Ezekwo v. N.Y. City Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991). That requirement "reflects both the historical evolvement of the rights of public employees, and the common sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick*, 461 U.S. at 143.

"The public concern inquiry is purely a question of law." *Eng*, 552 F.3d at 1070. "The plaintiff bears the burden of showing that [their] speech addressed an issue of public concern," *id.*, based on "the content, form, and context of a given statement." *Connick*, 461 U.S. at 147–48. The Court will address each of those factors in turn.

### i. Content

The first factor the Court must consider is the content of Plaintiff's communications.

Content is the "greatest single factor" in the public concern inquiry. *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009). The content of speech addresses a matter of public concern when the speech discusses "'issues about which information is needed or appropriate to enable the members of society' to make informed decisions about the operation of their government." *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940)). By contrast, speech is usually not of public concern if it touches "upon matters only of personal interest," *Connick*, 461 U.S. at 147, "deals with 'individual personnel disputes and grievances,'" *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (quoting *McKinley*, 705 F.2d at 1114), or "relates to internal power struggles within the workplace," *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996). And even where speech contains passing references to matters of public concern, it is not of public concern if its overall emphasis is on matters of personal interest. *See Desrochers*, 572 F.3d at 713 (acknowledging plaintiffs' statements made passing references to the "proper functioning of the police department" but concluding "the grievances amount to a laundry list of reasons why . . . employees found working for [plaintiffs' sergeant] to be an unpleasant experience").

Here, Plaintiff's communications with Evergreen employees primarily addressed "individual personnel disputes" and "internal power struggles within the work place." In 2012, Plaintiff had a conversation with the ICU's medical director about "poor communication over case management in the ICU." (*See* Dkt. No. 97-7 at 2.) In 2013, Plaintiff sent an email to Dr. Lee raising similar issues, including that ICU staff had "over-ridden and changed without discussion" his neurosurgical orders on a patient. (*See* Dkt. No. 97-16 at 2.) "Addressing these circumstances," Plaintiff complained, had caused him to "grow weary" from "stress and distraction." (*Id.*) One year later, Plaintiff requested a small-group discussion over "issues he sees with neurosu[rgery] comanagement." (Dkt. No. 97-9 at 2.) The matter required "no rush at all," Plaintiff emphasized. (*Id.*) Later that year, Plaintiff reported to Dr. Burks and Dr. Geise that he had "encountered the same disturbing barriers as in the past." (Dkt. No. 97-11 at 2.) Then in

2015, Plaintiff discussed clinical protocols with several Evergreen physicians. (Dkt. No. 97-12 at 3.) Once again, Plaintiff focused on "individual personnel disputes and grievances," explaining that he was "uncomfortable" with Evergreen imposing requirements on physicians without accepting some legal liability for patients; that he had "lost control" of a patient the last time he signed on to a protocol; and that a "small, but vocal minority of [Evergreen's] nursing staff" had a tendency to reflexively apply protocols regardless of the circumstances. (*See id.*)

In addition to focusing on individual personnel disputes, Plaintiff's communications emphasized how those disputes impacted him personally. In his 2013 email to Dr. Lee, for example, Plaintiff stated,

> To be honest, I've grown weary of the stress and distraction involved in addressing these circumstances. I've accordingly lowered my call burden by two-thirds (hence, fewer ICU admissions) and resigned myself to the fact that any patients I admit to our ICU for more than 1 or 2 days will no longer be mine, aside from maybe the care of the incision, etc.

(Dkt. No. 97-16 at 2.) And if there was any concern that Plaintiff was trying to make waves, he dispelled that notion when he said, "I really don't mean to oppose what appears to be a prevailing trend in ICU care at our hospital, but at the same time do not want to be insincere and tell you that it makes me happy." (*Id.*) Plaintiff's emphasis on how personnel disputes impacted him suggests that he was speaking about matters of personal—not public—interest. *See Desrochers*, 572 F.3d at 712–14; *Ezekwo*, 940 F.2d at 781.

Plaintiff disagrees that he raised concerns over ICU care out of personal interest and argues that he raised those issues "out of concern for patient safety." (Dkt. No. 95 at 21) (citing *Ulrich*, 308 F.3d at 979). However, references to patient safety are almost entirely absent from Plaintiff's communications. In fact, of the seven communications Plaintiff highlights, (*see* Dkt. No. 95 at 21) (citing Dkt. Nos. 97-7, 97-9, 97-11, 97-16, 97-19, 97-20, 97-21), only two arguably contain such references, (s*ee* Dkt. Nos. 97-7 at 2, 97-12 at 3). One of those communications appears to be another doctor's summary of a meeting Plaintiff had about the care of two patients. (*See* Dkt. No. 97-7 at 2.) In that summary, the doctor stated, "The overriding concern by all, as

well as [by Plaintiff], was the coordination and provision of appropriate quality care to these patients." (*Id.*) Yet what was actually said at the meeting is unknown. (*See id.*) In the other communication, Plaintiff briefly stated, "The key to excellent care is customization to individual patient needs (each patient is unique) and this is best done by an experienced, attentive and engaged physician, not an 80/20 Powerplan." (Dkt. No. 97-12 at 3.) But the rest of the communication focused on how Evergreen's policies might expose Plaintiff to legal liability and on how he lost control of a patient. (*See id.*) Thus, "the fact that [Plaintiff's] speech contains 'passing references to public safety[,] incidental to the message conveyed' weighs against a finding of public concern."[4] *Desrochers*, 572 F.3d at 711 (quoting *Robinson v. York*, 566 F.3d 817, 823 (9th Cir. 2009)).

Plaintiff also relies on *Ulrich v. City and County of San Francisco*, 308 F.3d 968 (9th Cir. 2002), to argue that "highlighting 'inappropriate standards affecting patient care at a public hospital . . . goes to the core of what constitutes speech on matters of public concern.'" (Dkt. No. 95 at 21) (quoting *Ulrich*, 308 F.3d at 979). Yet Plaintiff's communications are far different from those at issue in *Ulrich*. In that case, a physician objected to a hospital laying off other physicians. *Ulrich*, 308 F.3d at 973. The physician said that those layoffs were "an injustice to the patients," and he felt compelled to speak out even though the layoffs did not impact him. *See id.* at 972. Here, by contrast, Plaintiff complained of his personal disputes with ICU staff and emphasized how those disputes impacted him. (*See, e.g.*, Dkt. No. 97-16 at 2.) While those

---

[4] There are two communications in the record that contain more forceful statements about patient safety. (*See* Dkt. Nos. 97-8 at 2) ("[Plaintiff] is in denial of communic[ation] problems & outlined his obligation to 'get the p[atient] out of hosp[ital] alive.'"); (Dkt. No. 97-27 at 6) ("I still do not know why my two patients . . . had to die."). However, both statements were prompted by investigations into Plaintiff's competency. (*See* Dkt. No. 97-8 at 2) (statement made during a peer review of Plaintiff); (Dkt. No. 97-27 at 2–6) (information provided in defense of Plaintiff's "professional reputation"). That context strongly suggests that Plaintiff spoke to "protect [his] own reputation" rather than to address matters of public concern. *See Ezekwo*, 940 F.2d at 781. Moreover, "the mere fact that one or two of [Plaintiff's] statements could be construed broadly to implicate matters of public concern does not alter the general nature of [his] statements." *Id.*

disputes might have implicated patient safety, "the reality that poor interpersonal relationships amongst coworkers might hamper the work of a government office does not automatically transform speech on such issues into speech on a matter of public concern." *Desrochers*, 572 F.3d at 711. Plaintiff's citation to *Ulrich* is therefore unavailing, and the content of Plaintiff's communications weighs against a finding that he spoke on a matter of public concern.

<em>ii.    Form</em>

The second factor the Court must consider is the form of Plaintiff's communications with Evergreen employees. Although form is not as important of a factor as context, form still "help[s] [a court] identify [whether] speech . . . is of public concern." *Weeks*, 246 F.3d at 1235; *see also Desrochers*, 572 F.3d at 715 n.17 (rejecting dissent's attempt to "minimize" form as a relevant factor). This is "particularly [true] in close cases," *Weeks* 246 F.3d at 1235, because form, like context, helps shed light on "the *point* of the speech." *Ulrich*, 308 F.3d at 979 (quoting *Chateaubriand v. Gaspard*, 97 F.3d 1218, 1233 (9th Cir. 1996)). Where the speech's form is directed at a private audience, the speech is less likely to be protected. *See Desrochers*, 572 F.3d at 714–15. "Public speech," the Ninth Circuit has explained, "is more likely to serve the public values of the First Amendment. Private speech motivated by an office grievance is less likely to convey the information that is a prerequisite for an informed electorate." *Weeks*, 246 F.3d at 1235 (citations omitted).

In this case, Plaintiff bases his First Amendment claim on private emails and one event report that were sent to a limited number of doctors at Evergreen. (*See* Dkt. No. 95 at 21) (citing Dkt. Nos. 97-7, 97-9, 97-11, 97-16, 97-19, 97-20, 97-21). That "limited audience weigh[s] against [Plaintiff's] claim of protected speech." *Roe v. City and County of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997). It also stands in stark contrast to the speech in *Ulrich*, which was made at staff meetings, in a letter to the Department of Health, and in a publicly posted resignation letter. 308 F.3d at 979.

*//*

### iii. Context

The third factor the Court must consider is the context of Plaintiff's communications. Context plays a similar role to form, helping a court determine if the speech was meant to "bring to light actual or potential wrongdoing or breach of the public trust," one the one hand, or if the speech was "animated instead by 'dissatisfaction' with one's employment situation," on the other hand. *See Desrochers*, 572 F.3d at 715 (quoting *Connick*, 461 U.S. at 148).

The parties do not discuss in detail the context of Plaintiff's communications, and it is difficult to define the context of disjointed emails sent years apart from one another. (*See* Dkt. Nos. 80 at 20–21, 95 at 21, 100 at 8–9.) However, the limited context the Court can discern indicates that Plaintiff was in a years-long dispute over the allocation of authority within the ICU. (*See* Dkt. No. 97-16 at 2) ("A number of my . . . orders on a patient in the ICU were over-ridden and changed without discussion. And the issue of my patients being made DNR without my input still comes up from time to time."); (Dkt. No. 97-20 at 2) ("[Plaintiff] also expressed concern[] that code status was addressed with one of his patients without his knowledge."). That dispute was, at its core, an issue about Plaintiff's "bureaucratic niche." *Tucker*, 97 F.3d at 1210 (quoting *Nat'l Treasury Emps. Union v. United States*, 990 F.2d 1271, 1273 (D.C. Cir. 1993)). The public's interest in bureaucratic niches is minimal—even when the bureaucratic niche relates to a hospital. *Id.* Accordingly, the context of Plaintiff's communications weighs against a finding that he spoke on matters of public concern.

### iv. Conclusion

Plaintiff claims that he raised "broad concerns about . . . systemic abuse" at Evergreen. (Dkt. No. 95 at 22) (quoting *Dahlia v. Rodriguez*, 735 F.3d 1060, 1075 (9th Cir. 2013)). But the Court must "look to what [Plaintiff] actually said, not what [he] say[s] [he] said after the fact." *Desrochers*, 572 F.3d at 714. And what Plaintiff actually said to Evergreen employees was that ICU staff members were undermining his authority in a way that impacted him personally. That sentiment is not afforded First Amendment protection, particularly given that it was

communicated to such a small group of people in the context of an "individual personnel dispute[.]" *See Coszalter*, 320 F.3d at 973.

### 2. Plaintiff's Communications with His Patients

The Court will next analyze Plaintiff's communications with his patients. Defendants argue that those communications are unprotected by the First Amendment because Plaintiff made them pursuant to his official duties at Evergreen. (*See* Dkt. No. 80 at 22.) Once again, the Court agrees.

As an initial matter, the Court must identify "what [Plaintiff] actually said" to his patients. *See Desrochers*, 572 F.3d at 711. Although Plaintiff does not clearly identify what he said, he cites statements and summaries of statements that he made to various patients. (*See* Dkt. No. 95 at 21–24). Those citations indicate that Plaintiff counseled patients—often without consulting ICU staff members—to reject DNR designations or transfers to hospice care. (*See* Dkt. Nos. 14-25 at 3, 14-27 at 2–3, 14-28 at 2–3, 15-6 at 3, 97-5 at 2, 97-22 at 4, 97-34 at 2.) During his consultations with patients, Plaintiff does not appear to have told those patients of his "broad concerns about . . . systemic abuse" at Evergreen. (*See* Dkt. No. 95 at 22) (quoting *Dahlia*, 735 F.3d at 1075). Instead, Plaintiff advised his patients based on their particular circumstances and what he thought was the best course of treatment for them. (*See* Dkt. Nos. 14-25 at 3, 14-27 at 2–3, 14-28 at 2–3.)

Having identified what Plaintiff said to his patients, the Court must determine if he spoke to his patients as a citizen or as an employee. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). "[T]he determination whether the speech in question was spoken as a public employee or a private citizen presents a mixed question of fact and law." *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008). That question is answered in two stages. "First, a factual determination must be

made as to the 'scope and content of a plaintiff's job responsibilities.'" *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011) (quoting *Eng*, 552 F.3d at 1073). This initial determination is left to the jury unless the scope and content of the plaintiff's job responsibilities are "beyond the possibility for fairminded dispute." *Id.* at 967. "Second, the 'ultimate constitutional significance' of those facts must be determined as a matter of law." *Id.* at 966 (quoting *Eng*, 552 F.3d at 1071). This latter determination is made "by asking 'whether [the plaintiff's] speech owe[d] its existence to his [or her] position." *Kennedy v. Bremerton Sch. Dist.*, 869 F.3d 813, 824 (9th Cir. 2017) (quoting *Johnson*, 658 F.3d at 967).

### i. Plaintiff's Responsibilities

Plaintiff's job responsibilities, at least as they relate to his patients, are not reasonably disputable. Plaintiff is a neurosurgeon. As a neurosurgeon, Plaintiff must converse with his patients and their families about a variety of topics, including courses of treatment and end-of-life decision-making. (*See* Dkt. Nos. 14-25 at 3, 14-27 at 2–3, 14-28 at 2–3.) "Communication between a doctor and a patient" is, after all, "[a]n integral component of the practice of medicine." *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002).

### ii. The Constitutional Significance of Plaintiff's Responsibilities

Given that Plaintiff's job responsibilities included conversing with patients about courses of treatment and end-of-life decision-making, Plaintiff's communications with his patients were made "pursuant to [his] official duties" *Garcetti*, 547 U.S. at 421.

The Ninth Circuit has warned that "easy heuristics are insufficient for determining whether an employee spoke pursuant to his professional duties." *Dahlia*, 735 F.3d at 1069. Still, Ninth Circuit cases have established certain "guideposts" for making that determination. *See Kennedy*, 869 F.3d at 827. One particularly instructive case is *Kennedy v. Bremerton School District*, 869 F.3d 813 (9th Cir. 2017). In that case, the Ninth Circuit surveyed decisions about teacher speech and identified several factors that are relevant to identifying when a teacher speaks as a teacher or a citizen. *See Kennedy*, 869 F.3d at 827–28. First, the Ninth Circuit

observed that "teachers *necessarily* act as teachers . . . when (1) at school or a school function, (2) in the general presence of students, (3) in a capacity one might reasonably view as official." *Id.* at 827 (quoting *Johnson*, 658 F.3d at 968). Second, the Ninth Circuit said that teachers speak as teachers when their speech "'owes its existence' to [the teacher's] position as a teacher"—*i.e.*, when an ordinary citizen could not have engaged in the same speech. *Id.* (quoting Johnson, 658 F.3d at 966). Third, the Ninth Circuit held that the mere fact that a teacher spoke in contravention to their supervisor's orders does not transform the teacher's speech into citizen speech. *Id.* at 828. "If it [did]," the Ninth Circuit reasoned, "there would be no need for the *Garcettii* analysis because every First Amendment case in the employment context involves some degree of employer disagreement with the expressive conduct." *Id.*

When applied to this case, these principles compel the conclusion that Plaintiff spoke to his patients as a neurosurgeon, not a citizen. To begin with, Plaintiff spoke to his patients at his place of work, to those ordinarily considered to be his clients, and in a capacity that one would reasonably view as official. *See Kennedy*, 869 F.3d at 827–28 (holding football coach spoke as a teacher when he knelt and prayed on the fifty-yard line immediately after games while in view of students and parents); *Johnson*, 658 F.3d at 968 (concluding math teacher spoke as a teacher when he posted banners in his classroom with religious messages); (Dkt. Nos. 14-25 at 3, 14-27 at 2–3, 14-28 at 2–3). In addition, Plaintiff's speech "'owed its existence' to his position as a [neurosurgeon]" because his position gave him "special access" to his patients that an ordinary citizen would not have. *See Kennedy*, 869 F.3d at 827 (quoting *Johnson*, 658 F.3d at 966). Finally, Plaintiff's speech is not transformed into citizen speech merely because it violated Evergreen's co-management guidelines. *See id.* at 828. Plaintiff was still doing his job. He was just doing it in a way that violated Evergreen's policies.

Plaintiff appears to argue that even if he spoke as a physician, he has a "right as a physician to freely counsel his own patients." (Dkt No. 95 at 23.) But the case Plaintiff cites for that proposition—*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002)—is wholly inapplicable. In

*Conant*, the Ninth Circuit held that the federal government violated the First Amendment when it investigated doctors and initiated proceedings against them because they recommended the use of marijuana. *See* 309 F.3d at 637–38. *Conant* therefore involved the federal government regulating physicians in its capacity as a sovereign. Here, however, Evergreen took action against Plaintiff as his employer. "[W]here the government acts as both sovereign *and employer* . . . [,] the [Supreme] Court applies a distinct *Pickering*-based analysis that 'reconcile[s] the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission.'" *Johnson*, 658 F.3d at 961 (quoting *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004)) (citing *Garcetti*, 547 U.S. at 417–19; *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). That analysis gives government employers the ability to restrict employee speech without judicial interference. *See Garcetti*, 547 U.S. at 418–19 ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services.").

### iii. Conclusion

When Plaintiff counseled patients to reject DNR designations or transfers to hospice care, he may well have saved their lives. (*See* Dkt. No. 14-25 at 3.) However, the question here is not whether Plaintiff gave his patients good advice. The question is whether he gave that advice in his capacity as a doctor or a citizen. The answer to that question is inescapable: Plaintiff spoke to his patients as a doctor. Consequently, Plaintiff's speech was unprotected by the First Amendment, and Evergreen had the right to restrict his speech as it saw fit. *Garcetti*, 547 U.S. at 421–22.

### E. Plaintiff's § 1985(3) First Amendment Retaliation Claims

In a footnote, Defendant argues that "[b]ecause Plaintiff's § 1985 claims are derivative of his § 1983 claims, if Plaintiff's § 1983 claims are dismissed, his § 1985 claims fail." (Dkt. No. 80 at 16 n.9) (citing *Pennick v. Chestermani*, Case No. C18-5331-RJB-DWC, Dkt. No. 40 at 14

(W.D. Wash. 2019)). The use of footnotes to advance substantive arguments is highly discouraged. *See Glassybaby, LLC v. Provide Gifts, Inc.*, Case No. C11-0380-MJP, Dkt. No. 58 at 7 (W.D. Wash. 2011). That said, Defendants are correct that if Plaintiff's speech is unprotected under § 1983, then Defendants are not liable under § 1985(3) for conspiring to retaliate against Plaintiff for making that speech. *See Caldeira v. County of Kauai*, 866 F.2d 1175, 1182 (9th Cir. 1989) ("[T]he absence of a section 1983 deprivation of rights precludes a section 1985 conspiracy claim predicated on the same allegations.").

## III.  CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendants' motion for summary judgment (Dkt. No. 80). The Court GRANTS Defendants' motion as to Plaintiff's §§ 1983 and 1985(3) First Amendment retaliation claims. The Court DENIES Defendants' motion as to Plaintiff's §§ 1983 and 1985(3) procedural due process claims. The Court also GRANTS Plaintiff's motion to supplement the summary judgment record (Dkt. No. 102).

DATED this 21st day of January 2020.

John C. Coughenour
UNITED STATES DISTRICT JUDGE